SADIE SMITH, Executrix of the Estate of HENRY IRVIN SMITH, v. THE
HARBISON-WALKER REFRACTORIES COMPANY, a Corporation, Appellant.—100 S. W. (2d) 909.

Division One, January 5, 1937.

*F. H. Atwood* and *Hollingsworth & Francis* for appellant.

*A. C. Whitson* and *S. D. Flanagan* for respondent.

394

HYDE, C.—This is an action for damages, based upon defendant's alleged failure to comply with the requirements of Sections 13232, 13234, 13252, 13254 and 13264, Revised Statutes 1929. It is claimed that as a result of this failure plaintiff was caused to inhale dust containing silica and that he contracted the disease of silicosis. Plaintiff obtained a verdict for $11,041.66. Defendant appealed from the judgment entered thereon. After appeal was granted plaintiff died and the cause was revived here in the name of his executrix.

Prior to the beginning of the trial, plaintiff was permitted to file a second amended petition. The court overruled motions to strike this petition and to strike out the new matter therein. Defendant assigns this action as error, although it thereafter answered, on the ground that this petition constituted a variance and departure from the original cause of action stated. Defendant says that the original petition "had alleged that plaintiff was injured by dust generated in a 'room or enclosure' in defendant's plant where he worked during the years of 1931, 1932 and 1933;" but that the second amended petition "alleged that plaintiff was injured by the inhalation of dust generated in defendant's plant while he was working at a grinder in a shed in said plant during the years of 1928, 1929 and 1930." Defendant says that this substituted and added a new cause of action under the following test, stated in Scovill v. Glasner, 79 Mo. 449, and Jacobs v. C., P. & St. L. Railroad Co. (Mo. App.), 204 S. W. 954; "First, will the same evidence support both petitions; and, second,

will the same measure of damages apply to each?'' As amended, the petition stated that exposure to dust for the whole six years caused the injury.

This court has said that: ''If the test is to be simply that the *quantum* and quality of the evidence should be precisely the same, then the very purpose of allowing any amendments whatever would be defeated. . . . One test applied is: 'Would the recovery on the original complaint be a bar to a recovery on the amended complaint?' '' [Walker v. Wabash Railroad Co., 193 Mo. 453, 92 S. W. 83.] It is necessary that the character of the evidence shall be the same so the general identity of the transaction forming the cause of complaint remains the same. It is not objectionable merely that more or different incidents are alleged. ''As long as the plaintiff adheres to the . . . injury originally declared upon, an alteration of the modes in which the defendant has . . . caused the injury is not an introduction of a new cause of action.'' [Rippee v. K. C., Ft. S. & M. Railroad Co., 154 Mo. 358, 55 S. W. 438; see, also, Longworth v. Kavanaugh (Mo.), 190 S. W. 315; Bird v. Fox (Mo. App.), 193 S. W. 941; Sonnenfeld v. Rosenthal, 247 Mo. 238, 152 S. W. 321; Rolleg v. Lofton (Mo. App.), 230 S. W. 330; Broyles v. Eversmeyer, 262 Mo. 384, 171 S. W. 334; Baker v. C., B. & Q. Railroad Co., 327 Mo. 986, 39 S. W. (2d) 535; Jensen v. Hinderks (Mo. App.), 92 S. W. (2d) 108; Secs. 817-819, R. S. 1929.] Both the original and amended petitions adhere to the injury originally declared upon: A lung disease caused by breathing dust, at regular intervals during a continuous period of service in defendant's plant. The amended petition sets out the whole period of exposure while the orignial petition only stated a part of it, and it is alleged that it took the whole period to accomplish the injury. The amendment only stated more fully the place, the manner, and the occasions, alleged to have caused plaintiff to suffer the one resulting injury. We hold that it was proper for the court to allow this amendment.

Defendant assigns as error the refusal by the court of its peremptory instruction for a verdict at the close of the evidence. Defendant's contentions are:

''A. There was no proof either that the defendant was engaged in any work or process that produced occupational disease nor that the disease which plaintiff claimed to have contracted was an occupational disease.

''B. There was no proof that defendant knew, or could have known, that the dust generated at its plant was disease producing.

''C. There was no proof that there was any device or means known to be more effective than the devices and means used by defendant to prevent inhalation of dust.''

Plaintiff's evidence tended to show the facts hereinafter stated. Plaintiff was fifty-six years of age at the time of the trial. He did

farm work until he was twenty-eight. Then he worked for the city of Roodhouse, Illinois, until 1917. From 1917 to 1922, he was again on a farm. With the exception of three months' work wheeling brick at a brick plant in Alsey, Illinois, he had worked continuously since that time for defendant or its predecessor in the brick plant at Vandalia. Prior to 1928, when defendant became the owner of this plant, his work was either wheeling brick or construction work. During 1928, he began the work of grinding or "sizing" tile. For about a year, he was a grinder's helper. As a helper, he brought the burnt products to the grinder and wheeled them away after they were ground. As a regular grinder, he put them against the wheel to be ground. He had never worked in dust before he did this work at Vandalia. For most of 1928, 1929, and 1930, he worked in defendant's west shed grinding tile with a sixteen-inch carborundum wheel. This shed was open on the south so a man could walk under it. At least part of the time there were two grinders in the shed where plaintiff worked. There were no devices for removal of the dust made by these grinders, although one of them had a hood and stack but no suction fan. Plaintiff was forty-four years old when he went to Vandalia; his weight was 160 pounds; he was in good health; and he had never had any illness.

Concerning the dust from the grinder where he worked in the shed, plaintiff testified, as follows:

"You pushed this table and the wheel run towards you, throwed all the dust right towards you from the top of the wheel. While it was running from you, it throwed it the other way, and when it was coming back it throwed it to you, throwed it all over you, through your clothes and everything. . . . It would stop up my nostrils some, I would have to breathe a little through my mouth. . . . I would work a ten-hour shift, and if they were short of men they would call me back sometimes and work there half of the night. I have worked as much as sixteen hours out of the twenty-four."

Later defendant bought a new grinder from the Bridgeport Emery Wheel Company. Plaintiff and defendant differ about a year in fixing the time when this grinder was established in a room about 30x30 feet with a 16-foot ceiling. It had a suction fan that would take away about two-thirds of the dust when it was new. Plaintiff testified that later only about half of the dust from the grinding was collected by the removal device of the Bridgeport grinder. He said: "The fan motor played out; they couldn't keep bearings in it. . . . It was supposed to be running at 3400 when they got it. . . . They had to slow it down to eighteen hundred. . . . There was some breakdowns with the fan; we worked on the grinder all the same."

Plaintiff also testified that the room had no ventilating fans and that while there were windows, they were closed in cold weather. He said:

"They was kept open part of the time when it was warm enough in summer so you could work, but they were surrounded by sheds on the east, south and west. The north was the only open side. . . . The fine dust would just hang around in the room. . . . It would settle all over the walls and machinery. . . . The dust would go both ways, from the top of the wheel it would come towards the operator, from the bottom of the wheel would go the other way. Whenever you have a large tile all over the face of that wheel it will fill the room with dust."

Plaintiff also said that at times, the new grinder would break down and they would then work on the old grinder for a day or two. Plaintiff said that he weakened in 1932 and his "breathing begun to get bad." He said:

"I went to Mr. Gamble, the assistant superintendent, and I asked him if he had anything else that he could give me to do. He put me on some crating for a while, making crates and crating tile. . . . I told him I thought it was hurting me. . . . He said that dust wouldn't hurt nobody. At the time they had one man on the grinder, and when they needed a second one they put me back there. . . . I worked up until December of 1933. . . . Mr. Hardy, the superintendent . . . (also) said the dust wouldn't hurt nobody."

Plaintiff also said he tried to get a respirator, but was told "they didn't have no such thing or never did have." Plaintiff's testimony, as to his health, strength, and working conditions, was corroborated by the testimony of other workmen in the plant and neighbors. Some of this evidence as to the extent of the dust was, as follows:

Koppel: "In the new grinding room it wasn't very much dust, but there was some dust in there but not very much, but on the old grinder it was terrible. . . . There was dust all over, you couldn't hardly see the man."

Easterday: (The old grinders.) "Threw a terrific amount of dust out in front of the operator, and also around on the side wall. . . . It would throw it all over his face and body, sometimes you couldn't recognize him in there. . . . It was just like fog around there all the time the machine was operating. (On the Bridgeport grinder.) The dust is supposed to go through a dust collector and from there over to another pipe there that is supposed to catch the dust, but just about half of the dust goes through it . . . . The other half . . . just circulates around in the room."

J. H. Smith: (The 30x30 grinder room.) "Full of dust. . . . The grinder would throw the dust in his face, cover him all over with dust. . . . The floor would be covered with dust. They would have to quit early and clean it up. . . . They would be covered with dust, the machinery and pipes."

Tate: (The old grinders.) "Throws the dust all over a fellow. Over

the operator and over anything around there; the dust just stays where it is, just a fog in the air. . . . He would just be covered with the dust and he would have it all in his clothes and hair and all over his body and in his face.''

Bunch: (The old grinders.) ''When the grinder was working it was just a fog of dust all the time. . . . You couldn't hardly see him at times, the dust was so bad. . . . Had dust all over his face and his clothes and all over his hair.''

Shepherd: (The old grinders.) ''Both of the grinders outside was, dusty. . . . Depends a whole lot on which way the wind was, the suction of the wind, if it throwed back on him, what came off of the wheel would throw back on him I have seen him dusty, pretty dusty. (The new grinding room.) I have been in there sometimes when it was pretty dusty . . . if the grinding room was closed up. . . . In cold weather it was kept closed.''

Hobbs (defendant's witness who worked in 1933 as a helper to plaintiff in the new grinding room): ''I have seen him look pretty dusty at times. . . . There is some dust in there. . . . Not all of the time it is not as bad as it is others; there is times it gets a little bad. . . . I have seen it in there when it was pretty quiet, not much dust at all.''

Maune (defendant's witness and a foreman) said that the life of a carborundum grinding wheel in the plant was about three months. He said: ''There is dust there like in any industrial plant . . . men coming out of that plant . . . have some dust on them.''

Plaintiff had analyses made of eleven different kinds of brick and tile from defendant's plant which showed silica content of from 28.83 per cent to 56.97 per cent. The chemist said that he made no effort to determine the ''form that silica was in;'' that he did not know ''whether it is alumina silicate or whether it is worked up with calcium,'' and that ''as far as determining free silica in a clay product no one has been able to do it.'' He further said that he had ''no experience in making petrographic analyses (analysis of material by use of a special type of microscope), which defendant contended would show the amount of free silica present. (Defendant contended that the dust contained mostly only alumina silicate; that this was an inocuous dust; and that only free silica would cause silicosis.) This witness also said that the amount of silica shown by his analysis was the proportion of silicates by weight; and that was no indication of the amount of free silica present in any of the products. Defendant's manager said that no tests of dust were ever made prior to the commencement of this suit in 1934. Defendant's evidence also showed that particles of the dust were as hard as window glass and were not soluble in water.

Plaintiff had medical testimony to the effect that plaintiff was

suffering from a permanent disability; that he would require future medical treatment; and that his condition was incurable. Some of the matters brought out by the evidence of physicians who had examined plaintiff and his X-ray pictures was, as follows:

Dr. Sante: "There is an indication of actual beginning breaking down of tissue; I mean by that a slight, you might call it, decay or destruction of tissue within some of these areas. . . . It is pretty generalized, but with the most pronounced region in the lower lobes and. at the roots of the lungs on either side. . . . I think that the condition as you see it in the X-ray there is due to silicosis and probably beginning tuberculosis. . . . By silicosis . . . I mean damage of the lung from the entrance of larger quantities of silica than the patient's body can throw off by the natural defenses. . . . Regardless of the content of the analysis as read to me the X-ray picture is sufficiently characteristic for me to make diagnosis of silicosis. . . . The silicosis in this case did not cause lung destruction; that was the succeeding tuberculosis. . . . That is my idea."

Dr. Young: "It shows an extensive fibrosis or scar changes throughout both lungs; it is more dense in the right chest than it is in the left, but the thing is more or less bilateral, that is to say, both lungs are involved. . . . This, in my opinion, is a condition that is produced by the inhalation of dust. My diagnosis in this case is pneumonoconiosis, terminal type. . . . I mean by 'terminal type' that type of pneumonoconiosis that occurs in the latter stages or when the patient becomes incapacitated. . . . Q. What could cause the condition? A. The inhalation of the dust as you have stated. (In a hpothetical question stating facts shown by plaintiff's evidence). . . . The man could have gotten the condition as shown in the X-ray film by the inhalation of such dust as you have described."

Dr. Ehrlich: "Q. Based upon your examination of those X-ray pictures and based upon the examination of the plaintiff in this case, were you able to give a diagnosis with reasonable certainty as to what this man was suffering from? A. He appeared to be suffering from pneumonoconiosis with the possibility of an early pulmonary tuberculosis. Q. By pneumonoconiosis, Doctor, you mean what? A. Disease of the lung produced by the inhalation of dust." Plaintiff's counsel asked: "Whether or not you can give an opinion, based upon your examination, upon your reading of the X-ray pictures, and upon that hypothesis, with reasonable certainty, as to what in your opinion caused the condition this man is suffering from at the present time?" He said that he could, and his answer, to the hypothetical question stating the conditions under which plaintiff said he worked, was: "I think that the dust in all likelihood caused the condition. . . .

My opinion of this case is that the condition was caused by inhalation of dust."

Dr. Coil: "I found the patient was suffering from silicosis. . . . Dust particles go into the air cells, into the lymph channels, of which there are many throughout the lung, and in between all of those little air cells and find their way, and some lodge in the air cells, some in the lymph channels and others find their way out to the pleura producing a chronic pleurisy. . . . Fibrosis is the thickening of the walls of the air cells in the lymphatic spaces and they become thick and . . . they cannot contract or expand, . . . dust particles produce an inflammation around themselves and it is this inflammation which causes the fibrosis. . . . Q. And by silicosis you mean what, Doctor? A. An inflammation starting from the breathing into the cavity of the lungs dust. . . . We know tuberculosis will follow silicosis and go rapidly. . . . You can have an arrested T. B. . . . and breathe this dust and you will have a lighting up of all these symptoms immediately and go rapidly." He said that "tuberculosis, had not preceded the silicosis" in this case. He answered a hypothetical question, similar to the one asked Dr. Ehrlich, stating his opinion to be that plaintiff's condition was "due to breathing in of dust;" and he further stated it was from examinations and treatment of plaintiff that he formed his opinion that the cause of plaintiff's condition was silicosis.

Defendant's medical evidence was that plaintiff's condition was ordinary pulmonary tuberculosis which had existed from ten to twenty-five years; that there was no evidence of silicosis; and that the dust produced from fire clay products could not cause silicosis or any other lung disease. Defendant mined fire clay, made it up into various mixtures, pressed it into the shapes and sizes desired, and then burned it in kilns. Tile and brick, put through a grinding machine, are generally made from blue prints into special shapes and then placed upon the grinding machine for the purpose of smoothing, polishing and accurate sizing. The tile and brick placed through the grinding machine constitute less than one per cent of defendant's business.

According to defendant's evidence, when plaintiff came to Vandalia in 1922, he was then round-shouldered or stoop-shouldered, "seemed to be lacking in energy," and was assigned to one of the lower rated labor gangs and given a preference in his work, such as crating and packing. When the defendant took over the management of the plant in 1928, plaintiff became a helper to the regular grinder. The helper's duty is to bring the brick to the grinder and stack them by it. After they are placed through the grinder, they are stacked in stock piles or loaded into railroad cars. The helper is only near the grinder between fifteen and twenty per cent of his actual working time. The Bridgeport grinder was installed in December, 1929, and thereafter the old grinders were used less than one per cent of the time, and not to ex-

ceed three or four occasions of several hours each. The Bridgeport grinder had at least double the capacity of both old grinders. During the entire three years of 1931, 1932 and 1933, plaintiff worked a total of 294.5 days as a grinder and grinder's helper, or 32.7 per cent of his actual working time. Plaintiff. was only employed as a grinder at times when there was an overflow of work for the regular grinder to do. "When the day man couldn't handle the work . . . the night shift did the overflow work."

Defendant's evidence was also to the effect that. Bridgeport grinders were not generally in use until about 1930; that there were no efficient respirators until about that time; that the Bridgeport grinder was considered by experts and fire brick manufacturers throughout the country as being the approved and most adequate device for the removal of dusts known to the fire brick industry; and that respirators were not needed where this type of grinder was used. There was also evidence that all grinding on it was done on side of the wheel on the downward stroke; that the dust generated by it was thrown vertically downward; that the fine dust was sucked into the hood by action of the motor propelled suction fan and taken thence through the dust removing apparatus; that only coarse dust remained on or around the grinder, being in size from that of a pinhead to a quarter of an inch in thickness; that the men operating the grinders and their helpers smoked at their work and did not find it necessary to wear glasses; that in the winter workmen ate lunch in the grinding room and played checkers there while waiting for orders; that the dust in the grinding room was not more objectionable than at other places at the plant; and that during all of the time that plaintiff worked at the plant after the installation of the Bridgeport grinder, it was in continuous operation, except that the motor had to be rewound in June of 1931, at which time it was dismantled from June 18th to June 24th, and except when bearings burned out at periods of time from two weeks to three months, at which times it would be shut down approximately an hour. Tests were made by use of an anemometer, an air velocity measuring machine, under similar conditions to those existing when plaintiff worked in the grinding room at the Bridgeport grinder, and showed that the air in the room was completely changed every sixteen minutes. Some of defendant's witnesses from other fire brick plants, however, did say that respirators were furnished to their employees.

Defendant's medical evidence was that silicosis is produced only by the inhalation of fine particles of pure uncombined silicon dioxide, commonly distinguished by being called "free silica" or "quartz;" that the sizes of the particles of free silica, considered dangerous, are those with a diameter under ten microns (a microscopical size, since a micron is one twenty-five-thousandth of an inch); and that larger dust particles of free silica are not dangerous, because the human lung

is so constructed that it rejects or repels larger particles. It was also stated that silicon dioxide (free silica or quartz) when combined with any other chemical (except silicate of magnesium which is not present in fire brick) is innocuous or inert and cannot cause disease to the lungs; that aluminum silicate (the combination found in fire brick) constitutes the greater portion of the crust of the earth; and that everyone breathes some of it without being harmed. Even though dust contains free silica in particles of less than ten microns in size, defendant's experts considered it free from danger if there was less than twenty-five to thirty-five per cent of such particles in air containing not more than ten million dust particles to the cubic foot. It was further shown the amount of silicon dioxide (free silica or quartz) in a given product, such as fire brick, could only be determined by a petrographic analysis, which is in effect an actual count and measurement of microscopic cross-sections of the product. Walter D. Keller, geologist of Missouri University, made petrographic analyses for defendant of eleven samples of fire brick dusts generated at the Bridgeport grinder, using dust furnished plaintiff for chemical analysis. His analyses showed that the highest amount of silicon dioxide (free silica or quartz) in any of these specimens was 6.1 per cent, and that the lowest amount was 4.7 per cent, and that the average for all specimens was about 5 per cent. Dust counts taken in the grinding room, under usual operating conditions, showed that the highest dust count in the room at any time was eight million particles per cubic foot. It was said that there must be fifteen to twenty million dust particles per cubic foot in order to see dust in the air.

Defendant's request was for a peremptory instruction on the whole case. The statutes, which are the basis of plaintiff's suit, impose upon employers some standards and duties to their workmen, engaged in the industrial activities described, which are different from and more exacting than those imposed by common-law negligence rules. It is not necessary to discuss all these sections in considering whether plaintiff made a jury case because the trial court should not direct a verdict for defendant if plaintiff made a case on any theory pleaded. Section 13232, Revised Statutes 1929 (enacted Laws 1891, p. 161, and continued without amendment) merely requires that certain establishments ''shall be so ventilated as to render harmless all impurities, as near as may be.'' This makes no specific requirements as to equipment, does not purport to make the employer an insurer, and must be construed to mean: ''As near as may be necessary for reasonable safety. It, therefore, declares a principle very similar to, and which undoubtedly would be held, in the light of present day knowledge of such dangers, to come within the common-law requirement to furnish a safe place to work. [See Pevesdorf v. Union Electric Light & Power Co., 333 Mo. 1155, 64 S. W. (2d) 939, l. c. 948.] This section really amounts to a statutory declaration that

reasonably effective ventilation is an essential element of a safe place to work in modern commercial and industrial establishments However, under another section of the 1891 Labor Act, the Labor Commissioner's inspectors were authorized "to order a fan, or some other contrivance . . . to prevent the inhalation of dust," where dust was generated by the process used, so that by such an order an employer could be required to maintain equipment that might not be held necessary to meet the test of common-law duties. ■ This section was repealed in 1909 and present Section 13234, Revised Statutes 1929, enacted (Laws 1909, p. 333) to place the duty to provide specified equipment directly upon the employer, without any order or notice from anyone. Insofar as it applies to this case, this section provides: "Every person, firm or corporation using any polishing wheel or machine of any character which generates dust, . . . in its operation, shall provide each and every such wheel or machine with a hood, which shall be connected with a blower or suction fan of sufficient power to carry off said dust, . . . and prevent its inhalation by those employed about said wheel or machine." These are mandatory requirements, and the employer must himself determine when and what equipment is necessary to comply therewith.

Defendant relies upon Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W. (2d) 323, but that case discusses only the provisions of the Occupational Disease Act of 1913 (Laws 1913, p. 402), which we will consider in deciding the correctness of plaintiff's instructions. The provisions of Section 13234, Revised Statutes 1929, are directed against every kind of dust generated by a polishing wheel or machine, evidently on the theory that any dust, in the quantities produced by such mechanical means, would be harmful, and that reasonable care for the health of persons working with it or near it would require artificial means of removing such dust. [See Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 51 S. W. (2d) 114, l. c. 119.] According to defendant's evidence, any dust will irritate the lungs and this may aggravate certain conditions, although not every dust can cause dust diseases of the lungs. The requirements of this statute are specific and under them, as is true of Federal Safety Appliance Acts, the employer is "bound absolutely to furnish what before . . . it was its duty to exercise ordinary care to provide." [Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419; see, also, Wagner Electric Corp. v. Snowden (C. C. A.), 38 Fed. (2d) 599; Cropper v. Titanium Pigment Co. (C. C. A.), 47 Fed. (2d) 1038, 78 A. L. R. 737; Jacque v. Locke Insulator Corp. (C. C. A.), 70 Fed. (2d) 680; St. Joseph Lead Co. v. Jones (C. C. A.), 70 Fed. (2d) 475; Ford Motor Co. v. Brady (C. C. A.), 73 Fed. (2d) 248; First National Bank v. Wedron Silica Co. (Ill.), 184 N. E. 897; Madison v. Wedron Silica Co. (Ill.), 184 N. E. 901; Boll v. Condie-Bray Glass & Paint Co., 321 Mo. 92, 11 S. W. (2d) 48; Dodd v. In-

dependence Stove & Furnace Co., 330 Mo. 662, 51 S. W. (2d) 114; Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58; Langeneckert v. St. Louis Sulphur & Chemical Co. (Mo. App.), 65 S. W. (2d) 648.] There is nothing in this section to limit its application to disease producing dusts. Poisonous and disease producing dusts are treated by the sections enacted in 1913 and further requirements are made by them to prevent harm to employees from such dusts. While, of course, defendant would not be liable to plaintiff for damages unless the dust caused him injury, to recover under this section it was not necessary to prove that the injury caused was an occupational disease. (For example, even if plaintiff had tuberculosis in an arrested stage, defendant would be liable if the dust, whether it contained silica or not, reactivated or aggravated this disease.) [Jacque v. Locke Insulator Corp., supra.] Failure to furnish such a wheel or machine with a hood and blower or suction fan of sufficient power to prevent inhalation of dust in any injurious amounts, by workmen operating it, is negligence *per se*. It was only necessary for plaintiff here, in order to make a jury case under Section 13234, Revised Statutes 1929, to show: (1) That defendant used a polishing wheel or machine which generated dust (there was no real dispute about that); (2) that defendant did not provide its grinders with a hood, connected with a blower or suction fan of sufficient power to carry away the dust or so much thereof as to prevent its inhalation by plaintiff in injurious amounts (defendant clearly violated this statute by failing to provide any fan or blower on the old grinders, and plaintiff's evidence, if believed, was sufficient to warrant a finding that the suction fan on the Bridgeport grinder was not of sufficient power to comply with the statute); and (3) that plaintiff inhaled dust, sufficient in amounts and of such character as to injure him, and was injured thereby. Plaintiff's medical evidence was that inhalation of the dust generated by defendant's grinders was injurious to the lungs; that plaintiff's condition, at the time of the trial, was a condition or disease of the lungs, caused by dust, called pneumonoconiosis or silicosis; that the amount of dust, to which plaintiff's evidence showed he was continuously exposed over a period of about six years, was sufficient to cause this condition; and that, in the opinion of two of his physicians, it was the inhalation of the dust generated by defendant's grinders during his work therewith, as shown by his evidence, that did cause it. Plaintiff, therefore, made a case on a violation of Section 13234, Revised Statutes 1929, and regardless of whether or not plaintiff made a case under the Occupational Disease Statutes, the court properly refused defendant's request for a peremptory instruction.

Defendant also assigns error in the submission of the case by giving plaintiff's instructions 1, 2, 3, 4, 6 and 6A, and by refusing defendant's instructions 11, 12 and 14. Instruction 1 was based on

violation of Section 13234, Revised Statutes 1929, and was, as follows:

"The court instructs the jury that if you find and believe from the evidence that the plaintiff was in the employ of the defendant during the years of 1928, 1929, 1930, 1931, 1932 and 1933, and while in such employ was required by the defendant to operate sizers or grinders mentioned in evidence in smoothing up and grinding brick and tile to size, and that said sizers or grinders generated dust which was noxious, that is, hurtful and harmful, to one breathing same, and while plaintiff was operating said sizers or grinders quantities of dust were emitted from said sizers or grinders into the place, the shed or room where plaintiff worked, and said dust was noxious, that is, hurtful and harmful to plaintiff, and that defendant failed and omitted to provide said sizers or grinders or either of them with a hood connected with a blower or suction fan of sufficient power to carry off the dust from said sizers or grinders or either of them, and to prevent its inhalation by the plaintiff in quantities sufficient to be harmful, and that plaintiff inhaled said dust so generated, if you find it was so generated, and on account thereof his lungs were injured and diseased, then you will find the defendant was negligent and your verdict will be in favor of the plaintiff."

This instruction clearly requires the jury to find all the essential elements necessary to establish liability under Section 13234 hereinabove stated. Defendant's criticism is that "this instruction makes the defendant an absolute insurer of plaintiff's safety, and totally ignores the law which requires that the defendant must know, or could know, (1) that the dust was dangerous and (2) that there were known devices to prevent the inhalation thereof." Defendant's contentions cannot be sustained because the statute requires the kind of devices to be used (there is no contention that these requirements are impossible); because the statute requires this equipment if any kind of dust is generated by a polishing wheel or a machine; and because defendant was liable to plaintiff for any injury that he could prove resulted directly from a violation of this statute. This was a clear, concise, and correct instruction.

Plaintiff's Instruction 3 was based on Section 13232, Revised Statutes 1929, but it went even beyond its broad terms, authorizing a verdict for plaintiff if "defendant failed to ventilate . . . to *render harmless all* such *dust* as near *as could be done.*" The general language of this statute should not be used in an instruction and, as here stated, this instruction permitted recovery for failure to do anything that was possible, rather than fixing the standard to be reasonable means and reasonable safety in ventilation of places of work. [See Pevesdorf v. Union Electric Light & Power Co., 333 Mo. 1155, 64 S. W. (2d) 939, and cases cited.] Moreover, this section, insofar as it may apply to places of work about "any polishing wheel or ma-

chine of any character which generates dust,'' must be construed with Section 13234, Revised Statutes 1929, which definitely specifies the exact type of ventilating equipment which must be used in such circumstances. Having correctly instructed the jury by Instruction 1 as to the definite and specific mandatory statutory requirements concerning ventilation of plaintiff's place of work which in this situation were greater than the general requirements of Section 13232, Revised Statutes 1929, it was erroneous to go further and give the jury a roving commission to allow recovery for failure to provide anything else they might believe or imagine *could be* done to render harmless *all dust*. We do not say that there could not be circumstances which would require the employer to do more than provide a machine with a hood and suction fan or blower, either under the common-law or statutory duties. However, if it is claimed that such circumstances do exist, the jury must be told what they are and required to find them.

Instructions 2, 4, 6 and 6A are based upon the occupational disease statutes, Sections 13252, 13254, and 13264, Revised Statutes 1929. As we have hereinabove ruled, plaintiff made a case which could have been submitted under the sections of the 1891 act, as amended in 1909. He was not required to also make a case under the 1913 act (sections above cited) before he could go to the jury as defendant seems to contend. If the facts shown by his evidence made the occupational disease sections applicable, plaintiff had the right to also submit his case under them; but it is defendant's contention that it was error to instruct under these sections because plaintiff's proof did not make a case for the three reasons set out, at the beginning of this opinion, under defendant's contention that the court erred in refusing to direct a verdict for defendant. As noted, defendant relies upon Wolf v. Mallinckrodt Chemical Works, supra. In the Wolf case, the disease or condition of ''combined sclerosis—a degenerative process of the spinal cord'' was alleged to have been contracted from inhaling and absorbing ''poisonous gases, vapors, fumes and dust'' while making zinc stearate, a baby powder, by mixing, sifting, and boiling certain chemicals. The most that plaintiff's evidence there showed was that ''combined sclerosis . . . could be due to absorption of zinc.'' Plaintiff's own evidence also showed that syphilis could cause it, and there was much medical testimony, even from plaintiff's physicians, to show that plaintiff's condition might be ''locomotor ataxia, a post effect of syphilis.'' It would seem that the Wolf case might well have been ruled upon the authority of O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; and Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561, holding that ''evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the

possible causes did produce the condition, furnishes no basis from which a jury could determine the cause."

In the Wolf case, however, the court said: "The demurrer should have been sustained because there was no evidence that the disease which plaintiff contracted was peculiar or incident to the work or process carried on. Such evidence is essential to the proof of an occupational disease." There is a very different situation in this case. Plaintiff's proof showed long exposure to dust, lung conditions such as dust does produce, analyses of the dust showing contents that medical testimony said would produce a dust disease, and expert opinions that his exposure to this dust caused a diseased lung condition, and that this condition was silicosis. Defendant's evidence was to the effect that the dust generated by its grinders (which escaped its ventilating equipment) was insufficient in amount or in harmful silica content to cause silicosis or any other dust disease or to produce a substantial injury. This made a clear issue for the jury to determine what plaintiff's condition was and what caused it. Defendant says that there is no evidence that silicosis is a disease incidental or peculiar to the fire brick industry. However, it was shown by the evidence, that pure silica makes a dust poisonous to the lungs; that silicosis is a disease which is a natural and peculiar result of breathing dust which contains silica particles of a certain size, character, and quantity; so it undoubtedly is at least a reasonable inference that silicosis is incidental and peculiar to any work or process which produces and projects into the place of work silica particles of a harmful size, character and quantity. [See Gray's Attorneys' Text Book of Medicine, 171.] We, therefore, hold that the question of whether silica, in a form and quantity to cause silicosis, was caused to be present, in plaintiff's place of work, was a question for the jury on this record. Whether defendant could have known the danger in such dust is a question eliminated by the statutory requirements to prevent it.

We hold that it was proper to submit violation of the Occupational Disease Act Sections 13252, 13254, and 13264, Revised Statutes 1929, as grounds for recovery herein; but we find that the instructions submitting these grounds are erroneous in omitting to require the jury to find the essential facts which the Wolf case holds to be necessary to establish such violation. The parties did not have the Wolf case to guide them when this case was tried, but, since some of the questions raised here were not ruled therein we will further review the principal features of the occupational disease statutes as a further guide for drawing proper instructions, at another trial herein.

The 1913 act was entitled: "An Act to promote the public health by protecting certain employees in this State from the dangers of occupational or industrial diseases."

Section 1 (now 13252, R. S. 1929) provides: "That every employer of labor in this state engaged in carrying on any work, trade or

process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work, trade or process, to which employees are exposed, shall for the protection of all employees engaged in such work, trade or process, adopt and provide approved and effective devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work, trade or process." (Violation of this section was submitted as a separate ground of recovery by plaintiff's Instruction 2).

Section 2 (now 13253, R. S. 1929) declares the use of certain substances "to be especially dangerous to the health of the employees."

Section 3 (now 13254, R. S. 1929) provides that: "In all processes of manufacture or labor referred to in this section which are productive of noxious or poisonous dusts, adequate and approved respirators shall be furnished and maintained by the employer in good condition and without cost to the employees, and such employees shall use such respirators at all times while engaged in any work productive of noxious or poisonous dusts." (Violation of this section was submitted as a separate ground of recovery by plaintiff's Instruction 4.)

Section 13 (now 13264, R. S. 1929) provides for posting notices by employers "of the known dangers to the health of any such employees arising from such work or process and simple instructions as to any known means of avoiding, so far as possible, the injurious consequences thereof." The State factory inspector is also directed to prepare "a notice covering the salient features of this act," and furnish copies to employers to be posted by them. This requires posting of two notices—one to be prepared by the employer, and one to be prepared by state officials. Without lengthening this opinion to set out or discuss plaintiff's Instruction 6, which submitted failure to post notices as a separate ground of recovery, we hold that this instruction has similar defects to those criticized in the Wolf case (as well as others hereinafter discussed) submitting failure to post notices. What is said there (336 Mo. 746, 81 S. W. (2d) l. c. 333) should be sufficient as a guide for drafting a proper instruction covering this ground.

Plaintiff's real claim, founded upon these statutes, is that he was caused to contract the disease of silicosis. The principal fact issues on this feature of the case, upon which plaintiff had the burden of proof in order to recover under the occupational disease statutes and which plaintiff's instructions authorizing a verdict, should have required the jury to find in plaintiff's favor were, as follows:

(1) Is silica dust a noxious, poisonous or disease producing dust:

(2) Is there a disease of silicosis, which is peculiar to or the natural result of exposure to continuous breathing of silica dust? (These are not matters of which courts can take judicial notice and silica is not

specifically mentioned in Section 13235, Revised Statues 1929, as an "especially dangerous" substance.)

(3) Was silica present in the dust produced by defendant's grinders (that defendant's grinders did produce dust was not a controverted fact) in such form and quantity as to produce the disease of silicosis?

(4) Could exposure to the dust produced by defendant's grinders during the time when and in the manner which plaintiff was working about them or any of them produce the disease of silicosis?

(5) Did the hood and suction fan on the new Bridgeport grinder effectively prevent the production of dust in such form and quantity as would produce the disease of silicosis?

(6) Did plaintiff have the disease of silicosis?

(7) Did plaintiff contract the disease of silicosis from being caused to breathe dust produced by reason of defendant's failure to comply with any of the provisions of Sections 13252, 13254, and 13256, Revised Statutes 1929?

Plaintiff's Instruction 2, after hypothesizing the character and period of plaintiff's work, authorized a verdict upon the further finding "that such work in which the plaintiff was engaged for the defendant was a work which produced dust, if any, in sufficient quantities which might produce illness or disease peculiar to the work or process being done and carried on, and was a work which subjected plaintiff to danger of illness and disease, and that the defendant failed to adopt and *provide approved and effective devices* in the operation of any such sizers or grinders *for the prevention of any disease to the plaintiff* on account of such work or incident thereto while operating such sizer, and that by reason thereof the plaintiff on account of doing and performing said work for the defendant *contracted silicosis or other disease of the lungs* incident to said work and was injured and damaged thereby." (Our italics.)

It is obvious that the fact issues above set out were not made clear to the jury; that silicosis was assumed to be and was not required to be found to be a disease peculiar or incident to the kind of work plaintiff was doing (as required by the Wolf case); that, although plaintiff's proof was directed to showing that plaintiff contracted silicosis (or pneumonoconiosis, which, according to defendant's evidence, was not a disease), there was no required finding that the dust produced in defendant's plant would cause either disease; and that recovery was authorized for any disease of the lungs without regard to whether there was any evidence to show that plaintiff had such undesignated disease. Moreover, the instruction has the same faults, of being so vague and general as to give the jury a roving commission as was the one based on this act, condemned in Plank v. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328. The violation of the

statute required to be found is merely failure "to adopt and provide *approved and effective devices* in the operation of . . . sizers grinders *for the prevention of any disease* . . . incident thereto." This sets out only the general terms of the statute and not all of them at that; ("means or methods" omitted—defendant claimed making a complete change of air every sixteen minutes and keeping air content of dust particles below ten million per cubic foot were some methods it used for safety); and, as the Wolf case states, "not every instruction can be considered free from error merely because it is in the language of the statute, especially if that language calls for judicial construction." These statutes do not make an employer an insurer against any occupational disease; they make him liable if such a disease is contracted by an employee as a direct result of his failure to comply with their requirements.

The general language of this statute does require construction and it was construed in Boll v. Condie-Bray Glass & Paint Company, supra, as follows:

"We hold that the word 'approved' was not used in the sense that such device should be approved by one particular person or one particular state official, but that said word was rather used in the sense that the public approved of such means, method, or device, and adopted or recognized it as a suitable means to prevent the injury which the lawmakers hoped to avoid. [Coin v, Lounge Co., 222 Mo. 488, 1. c. 506, 121 S. W. 1, 25 L. R. A. (N. S.) 1179, 17 Ann. Cas. 888.]"

This demonstrates the error of giving the jury only the unconstrued general language and shows why defendant was entitled to an instruction to the effect that the test to be applied, in determining whether defendant complied with the requirements of Section 13252, Revised Statutes 1929, was: What devices, means or methods have been found by usage in other similar industries and under similar circumstances to be sufficiently adequate and effective for the removal of dusts so as to render similar places of work reasonably safe from danger of contracting any disease peculiar or incident to the work? We do not, however, approve the instructions offered by defendant which purported to state this test because they stated it too narrowly; because they ignored the requirements of Sections 13254 and 13264, Revised Statutes 1929; and also because Instruction 11 excused the failure to furnish a respirator, and the others excused the failure to do anything more than furnish a hood and fan, without regard to whether devices, means and methods used were sufficiently effective to prevent employees from contracting illness or disease, if any, shown to have been peculiar or incident to the work. A reference to the Coin case, cited in the Boll case, shows it is stated therein that "the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business;" that no one "is held by the law to a

higher degree of skill than a fair average of his profession or trade;" and that "the standard of due care is the conduct of the average prudent man." This case, at the place referred to, further states: "The test of negligence in employers is the same, and, however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way commonly adopted by those in the same business, is a negligent way for which liability shall be imposed." Therefore, the test, of what are "approved and effective devices, means, or methods," where no definite standard is fixed and no specific equipment is required by statute, is (just as is true in determining what is a safe place of work), "what is found to be reasonably safe by usage and is commonly and ordinarily used in other similar places, occupations, and business." [Pevesdorf v. Union Electric Light & Power Co., 333 Mo. 1155, 64 S. W. (2d) 939, l. c. 948.] "Of course, no usage can make a practice, which is inherently unreasonably dangerous, reasonably safe (Texas & P. Railroad Co. v. Behymer, 189 U. S. 468, 23 Sup. Ct. 622, 47 L. Ed. 905); but often no other evidence, of what is a reasonably safe method of conducting the complicated work of modern industry, is available except the methods tested by usage·in similar work" (Schaum v. Southwestern Bell Telephone Co., 336 Mo. 228, 78 S. W. (2d) l. c. 442); and, obviously, what is meant, by the test of usage, is usage by reasonably careful and prudent employers in establishments that are kept reasonably safe.

The United States Supreme Court in B. & O. Railroad Co. v. Groeger, supra, in considering the statutory standard fixed by the Federal Boiler Inspection Act, said: "It left to the carrier the choice of means to be employed . . . inventions are occurring frequently, and there are many devices to accomplish the same purpose. Comparative merits as to safety or utility are most difficult to determine. It is not for the courts to lay down rules which will operate to restrict the carriers in their choice of mechanical means by which their locomotives, boilers, engine tenders and appurtenances are to be kept in proper condition. Nor are such matters to be left to the varying and uncertain opinions and verdict of juries." The court further said that the presence or absence of a particular device "was a matter properly to be taken into consideration in connection with other facts bearing upon the kind and condition of the boiler in determining the essential and ultimate question; i. e. whether the boiler was in the condition required by the act." The court pointed out that under this act the difference between the common-law duty and the statutory duty of carriers was that the former only required that the employer exercise ordinary care to furnish safe appliances while the latter requires him absolutely to furnish them, so that he would not be excused even if he could not have discovered defects therein by the exercise of the highest degree of care. But the court said that "the

things required for that purpose (to be safe to operate) *were not* prescribed or *changed by the act.*" This question is further discussed in the opinion of this court in Satterlee v. St. L.-S. F. Railroad Co., 336 Mo. 943, 82 S. W. (2d) 69.

We note that the Illinois Occupational Disease Statutes, which are very similar to our own have been declared unconstitutional because considered too vague and uncertain, to establish a clear or intelligible standard of duty. [Park v. Libby-Owens-Ford Glass Co. (Ill.), 195 N. E. 616; Boshuizen v. Thompson & Taylor & Co. (Ill.), 195 N. E. 625.] The same contention was made in the Groeger case, but the court said: "It is as definite as is the common-law rule." We think that is true here and that by "approved and effective devices, means or methods," the Legislature clearly meant devices, means or methods which would make the place of work reasonably safe. Therefore, under this statute, to hold the employer liable it is only necessary to find that the devices, means or methods used were ineffective, to make the place of work reasonably safe from the dangers intended to be prevented; while under the common law he would not have been liable unless it was further found that he had either actual or constructive knowledge of the unsafe condition of the places, or of defects in whatever was used to make it safe (that is knew or could have discovered it by reasonable care or inspection, see Stoutimore v. A., T. & S. F. Ry. Co., 338 Mo. 463, 92 S. W. (2d) 658, and cases cited); but in either case the question, of whether the devices, means or methods used were adequate, effective or sufficient for the purpose intended, is determined by the same test, because this statute does not require any specific equipment. This is not true of Section 13254 which, under certain circumstances, requires that respirators shall be furnished. If these circumstances are shown to exist it is negligence *per se* to fail to furnish respirators and no custom or usage could change that; but to determine whether "adequate and approved respirators" were furnished, the test of reasonable safety does apply, and usage is a proper guide for determining that question.

The American Law Institute Restatement of Torts, Section 285, says: "The standard of conduct of a reasonable man may be established by a legislative enactment . . . which is final and conclusive, except insofar as the enactment requires construction or creates a standard so vague as to require definition by a court or jury before its application to the facts of a particular case. . . . By prohibiting a particular act for the purpose of protecting the interests of some person or class of persons as individuals, the legislative body declares its opinion that the risk involved therein is unreasonable." The illustration is given of a statute requiring railroads to equip cars with automatic couplers, which fixes a definite standard of conduct. The illustration is also given of a statute which requires moving machinery to be "reasonably guarded," and which term is

judicially construed "as requiring the installation of any known guard which does not unduly interfere with the practical operation of the machine." It is said that "such an act establishes a standard which is partially defined by judicial decision but which requires the jury to determine in each case whether a particular device does or does not interfere unduly with the operation of the machine."

That is the situation we have here. As we have shown, when the statute requires specific equipment like automatic couplers, suction fans, or respirators, they must be used or the employer is held to be negligent and is liable for whatever damage results from his failure to do so. However, since the standard here fixed by statute (Sec. 13252, R. S. 1929) is no more definite than the common-law standard, it required construction, in order to determine what standard it meant to set up for employers. In the Boll case, this court construed it (we think correctly) to mean the standard of what was approved by the public, which from its reference to the Coin case meant approval by usage of that part of the public engaged in business or industry where such devices, means or methods could be used, because no other part of the public could use, recognize, approve, know about, or have any standards concerning them. The jury should be so instructed.

Since the statute also requires that the devices, means, or methods used shall be "effective," plaintiff's Instruction 6A was not erroneous because it told the jury that although defendant "used a Bridgeport grinder with a hood and suction fan to carry off the dust generated by the Bridgeport grinder in grinding fire brick and tile, and that such grinder was one generally approved by the trade or business in which defendant was engaged, and that dust was emitted from said sizer or grinders into the room where plaintiff worked . . . in sufficient quantities to be noxious, that is hurtful and harmful to the plaintiff, that the fact that defendant used the Bridgeport grinder did not relieve it of its duty to ventilate said room so as to render harmless all impurities therein as near as may be or to provide the plaintiff with a respirator while working on said Bridgeport grinder, or to post notices of the known danger, if any, to the health of the plaintiff arising from the work." Of course, if in spite of the dust removal device used, dust was emitted into plaintiff's place of work, in such quantities as to be harmful, such device would not be "effective" and further "means or methods" would be required by the statute, as they would be even to comply with the common law standard of a safe place of work. No usage in industry would make it proper to use as safety equipment, a device which did not make the place of work reasonably safe, and which failed to accomplish the purpose for which it was intended. This instruction does, nevertheless, have the fault that it overlooks the fact that Sections 13252, 13254, and 13264, Revised Statutes 1929, are directed

not merely against dust which may be harmful in any respect to employees (which is the purpose of Sections 13232 and 13234, R. S. 1929); but that their purpose is to protect employees from dust (fumes, gases and other things not present in this case) which may produce illness or disease peculiar or incident to the work. The same thing is true of plaintiff's Instruction 4, which covers the duty to furnish respirators under Section 13254, Revised Statutes 1929. We think that the above discussion disposes of defendant's assignment concerning exclusion of opinion evidence concerning the necessity for furnishing respirators.

Defendant's final contention that the certificates of approval of conditions in its plant, after inspection by the Commissioner of Labor, were a defense to plaintiff's action is without merit. The duty to comply with both the specific requirements and general standards of these statutes is an absolute and mandatory duty directly placed upon the employer by the Legislature which does not depend upon any approval or disapproval of the Commissioner of Labor. It is for the employer himself to determine what is necessary to comply therewith. [Zajkowski v. American Steel & Wire Co. (C. C. A.), 258 Fed. 9, 6 A. L. R. 348.] If it is shown that the employer has failed to comply with any such requirement and that an illness or disease peculiar or incident to the work (or, in case of violation of Sections 13232 or 13234 that any injury has resulted) has been contracted by an employee as the result thereof, then the employer is liable in damages therefor.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.