ROLLA WOMMACK, Appellant, v. CHARLES T. ORR.—No. 38634.—176 S. W. (2d) 477.

Division One, December 6, 1943.

*Roy Coyne* and *Emerson Foulke* for appellant.

*Allen McReynolds* and *Paul E. Bradley* for respondent.

BRADLEY, C.—Action to recover $25,000 damages for injuries alleged to be the result of the occupational disease of silicosis, and alleged to have been caused by the negligence of the defendant. At the close of plaintiff's case the trial court directed a verdict for defendant. The jury returned a verdict as directed; judgment was entered thereon, and plaintiff appealed.

As to the negligence alleged, plaintiff, in the brief, says: "The petition charges common law negligence only. There are two specific charges of negligence in the petition, first, that the defendant negligently failed to provide the plaintiff with a reasonably safe place to work, and second, that the defendant negligently failed to warn the plaintiff of the dangerous conditions under which the plaintiff was required to work, although the defendant knew or could have known by the exercise of ordinary care that the plaintiff's place of work and the conditions under which he worked were dangerous and would injure plaintiff's health."

The answer was a general denial. There is no claim that the cause is one under the Workmen's Compensation Act.

Plaintiff testified that he commenced work for defendant in November, 1932; worked till February, 1935, then was on the farm about a year, and returned to defendant in March, 1936, and continued to work for defendant until July 11, 1940. Plaintiff's work was hauling ore. Three men constituted a hauling crew, and the ore was loaded on a truck at an ore bin and then hauled to a railroad car and unloaded therein, and plaintiff "was paid by the car." Part of the time plaintiff worked in the cars into which the ore was unloaded from the trucks. Of his work in the car plaintiff testified:

"They (the two other men) hauled the ore to the car and shoveled in the car and my job was to put it back in the car so that the car could be loaded up to capacity and be kept away from the door as much as possible. They went to the bins and loaded it in the truck. . . . When the truck gets to the car, two of them unload and the man in the car throws it back. . . . This dust would fly; get in your mouth and your eyes and nose and your ears; all over you and

you have to hunt air. By that I mean when the dust would get too thick from float ore, you would have to hunt air. . . . I seen it so thick you had to hunt air so you could breathe with any ease at all. . . . My face and nose would be anywhere from, I should say, two feet to three feet from the ore. . . . The two men standing in the truck picked up the canvas (between the truck and the car) and give it a flip so what ore is on there would go in the car. That would cause just as much or more dust to accumulate than the shovel would. . . . I was exposed to this dust practically all of the time in the eight to fourteen hours a day that I worked. . . . The dust accumulated on my arms and on my face, on my clothes. . . . It got in my nose and my eyes and my ears. I could certainly feel the effects of breathing the dust; it would just be dust in your nose or your mouth; you could see this dust in the air through the sunshine; you could see it otherwise than in the sun any time if you wanted to look for it. In the air the dust in the float ore looked more like, I should say, smoke than anything else.''

Plaintiff also worked at the bins in loading the ore, and of this work, he testified: ''Dust accumulated around the loading operations from the bins to the truck. Some of these bins are closed bins and some are open. I have seen dust in closed float bins until I would have to go to the window and stick my head out and get a good breath. There would be particles of dust on the coarse ore there the same as there would be in the car, and when shoveling it out of the truck the dust would be just practically the same as other places. The conditions were the same there, I will say, as they were the other places because the stuff flies there the same as it would be in loading into the truck or backing into the car. You could see it in the air if you wanted to look for it; you didn't stop to look for it, of course, when you were working that way. . . . I first learned that I had dust on my lungs in April, 1939. . . . There was no interruption in my employment with Mr. Orr from March, 1936, when I went back to work for him until I quit on July 11, 1940. Around a year or so before I quit I noticed that there was something wrong with me; I noticed shortness of breath; easily fatigued, weakness. About two months before I quit I had pains in my chest. . . .

''I have made complaint to Mr. Whitescarver · (defendant's foreman) about these dust conditions; I complained about the dust and the stuff flying and he always said it won't hurt you; I complained a number of times; I couldn't enumerate them from the time I first started to work until I quit, and his answer was always the same— that it won't hurt you. I was never provided with a mask or any protective device. . . .

''After this law suit was filed, I went around to the various mines that I worked at and secured some samples of ore from each; . . . . I believe I got the samples in a tobacco can and marked each can

where I got the ore from and delivered them to my attorney, Mr. Foulke. The ore I got samples of and gave to him was practically the same ore that I had been shoveling and handling and hauling for Mr. Orr for the past seven or eight years; was practically from the same piles and secured from the same mines and the same mills."

The samples of ore delivered by plaintiff to his counsel were classed as coarse ores and flotation ores, six of each. C. V. Millar, an assayer in Joplin for 42 years, examined these as to percentage of silica content, and the percentage that would pass through a 100 mesh and 200 mesh screen, and, as we interpret, found as follows:

## COARSE ORES

| No. of Sample | Through 100-mesh screen | Through 200-mesh screen | Silica content |
|---|---|---|---|
| 1 | 1.05% | .14% | 2.26% |
| 2 | 13.30% | 1.93% | 3.42% |
| 3 | 20.56% | 1.12% | 2 % |
| 4 | 11.10% | .80% | 7.40% |
| 5 | 1.95% | .35% | 4.80% |
| 6 | 2.61% | .39% | 3.25% |

## FLOTATION ORES

| No. of Sample | Through 100-mesh screen | Through 200-mesh screen | Silica content |
|---|---|---|---|
| 7 | 99.75% | 89.65% | 2.58% |
| 8 | 99.55% | 88.50% | 6.05% |
| 9 | 99.90% | 70 % | 3.62% |
| 10 | 93 % | 85.10% | .74% |
| 11 | 99 % | 78% | .74% |
| 12 | 99 % | 81.50% | 2.66% |

Millar testified that he made a composite sample from about 7500 samples of ore which he, himself, collected over a period of four and a half years, from the Oklahoma and Joplin districts (plaintiff's work for defendant was in both these districts); that the number of samples from each district were about the same. The average silica content of the twelve samples collected by plaintiff was 3.29% and that of the 7500 samples collected by Millar was 4.72%. The over all average silica content was 4.005%.

Dr. A. B. Murray testified that he had examined some 3,000 men "for chest ailments"; that he examined plaintiff and found that he had silicosis; that "silicosis is a destructive process of the lymphatic nodules of the lungs; . . . these nodules absorb the silicon and therefore become hardened, and as they become hardened they are not elastic as they should be; they naturally decrease in vital capacity

of the lungs and by doing so, decrease the patient's ability to breathe and get the proper amount of air into his lungs. It is caused by silicon dioxide. In ordinary terms, that is dust that has come from certain type of rock. In other words, dust from a field; or even from the roadway will not do it, but ▆▆ dust from certain type of rock, which is an ore bearing rock containing silica, if that dust is ·enough, it will produce this condition of the lungs. Zinc dust in this area has quite a high content of silica. . . . In this particular area and in this district . . . there is a substantial amount of silicosis; very much more than in the ordinary place. . . . Silicosis is a disease which results from continued exposure to the dust condition.''

Dr. Ellsworth Moody examined plaintiff and said that he had silicosis. A hypothetical question embracing the conditions under which plaintiff worked, as shown in plaintiff's evidence, was presented to Dr. Moody and he answered: ''It is entirely conceivable and probable that the inhalation of the silica as outlined in the question could be and probably was responsible for the silicosis which the man is now suffering. Four and a half per cent of free silica in the air is considered dangerous.''

Defendant says that the demurrer to the evidence was properly sustained because there was no substantial evidence tending to show: (1) That the disease of silicosis is peculiar to and the natural result of the kind of work plaintiff did; (2) that plaintiff's silicosis resulted from his employment with defendant; and (3) that those engaged in a business like or similar to that of defendant had established a standard of care to protect their employees from exposure to silicosis, and that defendant had failed to adopt such standard. .

▆▆ In an action by an employee to recover damages, from the employer, resulting from an occupational disease, acquired in the employment, absent evidence that the disease was acquired in the employment, it must be shown that the disease is peculiar to or incident to the work in which the employee engaged. Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W. (2d) 323, l. c. 327; Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 100 S. W. (2d) 909, l. c. 919. The Wolf case was to recover damages caused by the occupational disease of combined sclerosis, a degenerative process of the spinal cord. The Smith case was to recover for silicosis. In the Wolf case it was said [81 S. W. (2d) l. c. 327] that ''the demurrer should have been sustained because there was no evidence that the disease which plaintiff contracted was peculiar or incident to the work or process carried on.'' In the Smith case the above excerpt from the Wolf case was quoted, and then this [100 S. W. (2d) l. c. 919]: ''There is a very different situation in this case. Plaintiff's proof showed long exposure to dust, lung conditions such as dust does produce, analyses of the dust showing contents that medical testimony said would produce a dust disease, and expert opinions that his

exposure to this dust caused a diseased lung condition, and that this condition was silicosis.''

In the present case the evidence showed long exposure to silica laden dust, and it is fair to say that plaintiff's evidence tends to show that the silica content of the dust was in the neighborhood of 4%. The average silica content of plaintiff's samples was 3.29%. The average of the Millar samples was 4.72%. The over all average, as stated, supra, was 4.005%. Also, Dr. Moody testified that inhalation of dust ''charged with three to six per cent silica for a period from six weeks up to six months would or could result in silicosis. It would probably result in silicosis.'' There was no evidence that the disease of silicosis was peculiar or incident to plaintiff's work of hauling ore, but in view of the facts in evidence, such was not essential. Smith v. Harbison-Walker Refractories Co., supra.

█ Was there substantial evidence that plaintiff acquired silicosis in his work of hauling ore for defendant? Dr. Moody testified: ''I first saw him (plaintiff) April 16, 1942. The history which I indicated told me that the condition had prevailed for eight or ten years. I obtained that information from the patient, from the plaintiff himself. He revealed to me in the course of the conversation and detailing the history of his experiences that he had this trouble for eight or ten years.''

As stated, plaintiff began work for defendant in November, 1932; the trial was January 25, 1943. Prior to working for defendant, plaintiff worked ''in the ground in the mines'' for about four or five years between 1920 and 1930, and Dr. Murray said that it was possible that plaintiff contracted silicosis from working in the mines. But, if such be so, it was, we think, a question for the jury as to whether he acquired silicosis while working for defendant as ore hauler.

Should the demurrer to the evidence have been sustained because there was, as defendant contends, no substantial evidence that those engaged in a business like or █ similar to that of defendant had established a standard of care to protect their employees from exposure to silicosis, and that defendant had failed to adopt such standard?

█ Plaintiff presented to Dr. Murray the following hypothetical question: ''Doctor, in an employment where it has been shown that a man was required to work at loading and unloading zinc ore, some of which had fineness sufficient that 75 to 80 per cent of it would go through a 200 mesh sieve, or screen, and which showed an average silica content of about 4 per cent, 4 to 4-½ per cent ranging from as low as 2 per cent to and around 7 per cent, in which the person was required to shovel the ore partly from enclosed bins and partly from closed bins into a truck and then was also required to shovel the ore inside of the railroad car from where the ore was unloaded from the truck in what was called a leveling process, and in which this dust would often be present in sufficient quantities to be like, appear like,

smoke, and in which it was always present in sufficient quantities that it could be seen in the air and in which it was sometimes present in such quantities that the workers were unable to stay there at all, would that, in your opinion, doctor, be a condition which would require the adoption of some device for the protection of those people working under those conditions?''

Defendant interposed the objection that the question did not ''represent an accurate portrayal of all the conditions which existed'', and was sustained. Then this question was asked Dr. Murray: ''Well, assuming those conditions, and assuming that there is dust existing in those conditions, it is usual or customary to furnish appliances to protect the worker in breathing the dust?'' Thereupon counsel for defendant requested and was granted leave to ask Dr. Murray certain qualifying questions, and the following occurred:

''Q. Doctor, you say you have lived in the district three and a half years? A. That is right. Q. And have been practicing medicine all that time? A. Yes. Q. You have been identified with the hospital all that time? A. Yes. Q. And your work in the practice has been such as to keep you actually occupied as a medical man, isn't it? A. Yes. Q. Now, I will inquire, have you been engaged in the business of hauling ore? A. No, sir. Q. Do you have any acquaintance with the organization that exists among the ore haulers for doing that kind of work? A. I am not sure I understand what you mean by that. Q. Well, I inquire, do you have any personal acquaintance from experience or otherwise, or observation as to the type of organization that is used by either corporations or individuals who are engaged in hauling ore from the bins to the car? A. I do not. Q. Have you ever had any direct personal contact or experience in that type of work? A. No.'' Counsel then challenged the qualification of Dr. Murray as an expert on the subject matter under inquiry, and was sustained.

Plaintiff then made the following offering: ''We offer to show by this witness that in trades where there is evidence of the existence of an amount of dust where the workers are employed and which they are required to breathe, which dust is of a similar content of the dust shown to exist in the working conditions here, that it is usual and customary to provide the workers with masks or other appliances to prevent such dust and substance from being taken into the lungs; and we also offer to prove that the existence of conditions as outlined in the hypothetical question and as shown to exist in this case are dangerous to the health of workers who are required to work under such conditions.'' The offering was refused and, in the brief, defendant says that the refusal was ''on the grounds that the doctor had failed to qualify as an expert who had any knowledge which would warrant the reception of the testimony.''

It seems quite clear from Dr. Murray's evidence that he had no

knowledge by experience or otherwise as to what precautions were taken by those engaged in a business similar to that of defendant to protect the employee from silicosis. Prior to the hypothetical question, Dr. Murray, in response to a question, said that "there are standard appliances available for the protection (from silica laden dust) of those workers in the better mines and mills in those particular occupations where dust accumulates." Objection was made and sustained as "to what happens in the better mines and mills because we haven't that type of case."

 From the record the inference is that defendant carried on the business of ore hauling in about the same manner as did all others in the mining districts concerned. Counsel for defendant, in the brief, reflect the situation thus: "Lead and zinc ores have been produced in the southwestern part of Missouri for more than fifty years. During all of that time the ore buyers have purchased ore and hauled it from the mines to the cars and loaded it. These ore buyers have established a regular usage on the conduct of their business which has been little changed over the years, save for the use of trucks in lieu of horses and wagons."

"No one is held by the law to a higher degree of care than the average in the trade or business in which he is engaged. . . . A man, in conducting his business in the way that everybody else in a like business does, has measured up to the standard demanded by the law and has exercised the ordinary care of prudent men engaged in the business." McClaren v. G. S. Robins & Co., 349 Mo. 653, 162 S. W. (2d) 856, l. c. 858, and cases there cited. See also, Urie v. Thompson et al., 352 Mo. 211, 176 S. W. (2d) 471, handed down concurrently herewith.

"No man is held to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and, however strongly they may be convinced that there is a better way or less dangerous way, no jury can be permitted to say that the usual and ordinary way commonly adopted by those in the same business is a negligent way, for which liability shall be imposed. Juries must necessarily determine the responsibility of individual conduct, but they cannot be allowed to set up a standard which shall, in effect, dictate the customs or control the business of the community." Reichmuth v. Adler, 348 Mo. 812, 155 S. W. (2d) 181, l. c. 183, and cases there cited.

Measured by the applicable law of negligence, we do not think that plaintiff made a submissible case. The demurrer to the evidence was properly sustained. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.