Sherman L. Smith v. Stanolind Pipe Line Company, Appellant.—
No. 39222.—189 S. W. (2d) 244.

Division One, July 2, 1945.

Rehearing Denied, September 4, 1945.

*Donald Campbell, T. W. Arrington* and *R. R. Brewster, Jr.,* for appellant; *Brewster, Brewster & Brewster* of counsel.

*W. A. Franken, D. D. Thomas, Jr., Crawford & Harlan* and *George H. Miller* for respondent.

■ ■ DALTON, C.—Action for damages for personal injuries sustained and diseases contracted by plaintiff on account of alleged negligence of defendant. The petition charged a violation of the several occupational disease statutes and alleged that, as a result of such violation, plaintiff contracted fibrosis of the lungs and enlargement of the heart from the inhalation of harmful quantities of hydrogen sulphide gas. The cause was submitted under Sec. 10211, R. S. 1939, requiring employers "carrying on any work, trade or process . . . which subjects the employee to the danger of illness or disease incident to such work, trade or process, to which employees are exposed" to "adopt and provide approved and effective devices, means or methods" for the protection of such employees and "for the prevention of such industrial or occupational diseases as are incident to such work, trade or process." Verdict and judgment were for plaintiff in the sum of $18,000, and defendant has appealed.

In view of the issues presented, we shall state the evidence most favorable to plaintiff and omit defendant's evidence, unless it aids the plaintiff's case.

Defendant operated a system of pipe lines for transporting sweet crude petroleum from Texas oil fields to Indiana refineries. The system, as it extended through Lafayette and Carroll counties, consisted of four parallel lines of eight, ten and twelve inch pipe, laid 2 to 3 feet below the surface and extending through certain gatehouses and pumping stations. In 1932 defendant began using the 8 inch line for the transportation of sour crude oil from Winkler County, Texas. This oil was collected in storage tanks by other companies or was piped directly from oil wells to Ranger, Texas, where it was turned over to defendant for transportation. The distinguishing feature of this sour crude oil was that it contained hydrogen sulphide.

Hydrogen sulphide is a poisonous, toxic, irritant gas, having an obnoxious odor and, when the concentration of the gas is sufficiently high, it is definitely lethal. "There isn't a more dangerous gas." The gas is heavier than air and accumulates in low places. The amount of this gas carried in solution in sour crude oil varies, being dependent upon the particular wells from which the oil comes, the time of storage and other factors. The gas is given off slowly by the sour

crude oil when there is a leak in the pipe line or when the oil is otherwise released from confinement. Plaintiff offered no direct evidence as to the extent of the concentration of hydrogen sulphide gas at any particular time in the sour crude oil being transported by defendant, or the amount of the gas given off at any time or place. Plaintiff relied entirely upon circumstantial evidence and certain admissions of defendant.

There was evidence that the amount or extent of concentration of hydrogen sulphide gas in the sour crude oil, as it came from oil wells in the Winkler oil field, was "about 70,000 parts per million." Some estimates said "30,000 to 70,000 parts per million," and that the percentage was "from 1.8 to 7.18." The presence of hydrogen ▮ sulphide gas in the sour crude oil was well known to defendant.

Prior to commencing the transportation of this sour crude oil, defendant, through its safety director, made an investigation to determine whether there was danger in handling it. Information was obtained from the safety director of an oil company that "for many years had been handling and transporting Winkler sour crude oil." Defendant then notified its employees that they could tell the difference between sweet and sour crude oil by the smell; that the gas and fumes from sour crude oil were dangerous; that "it would kill you"; and it was necessary to be careful; that it was not safe to work with sour crude oil without a mask; and that employees should get away from leaks and stay on the windward side. No different orders were ever issued, but defendant claims that, after a short experience in handling the oil, masks were discarded as unnecessary and its employees refused to wear them. In 1932 plaintiff, working as a repairman, was furnished a mask and instructed to use it and did use it in repairing leaks in the pipe line. In 1932 masks were supplied to some pipe line walkers, and all employees were directed how to put on and take off masks, but when plaintiff became a pipe line walker in 1933 he was not supplied with a mask and he received no instructions or warnings about the danger of hydrogen sulphide gas in or about gatehouses or how to avoid the danger in such work. At that time plaintiff was in good health and had had no difficulty with his heart and lungs.

Plaintiff's duty as a pipe line walker was to inspect the line for leaks and washouts on a 40 mile section of the line between Dover and Carrollton, Missouri. He walked approximately 80 miles per week and inspected the gatehouses, pipe lines and equipment in this portion of defendant's line. The gatehouses were corrugated iron buildings, 18x20 feet, with a concrete foundation. The windows and doors were covered by corrugated iron and were kept closed and locked, except when opened for inspection. In the end of the buildings near the roof were certain ventilators. These buildings housed the crossovers, gates and valves used in transferring oil from one

pipe line to another of the several pipe lines that passed through the buildings. The floors of these buildings were about four feet below the top of the concrete foundations.

Plaintiff was directed to clean the gatehouses on his section of the line and each day to drain off any leakage in the valve chambers or crossovers between the pipe line carrying the sour crude oil and the other lines. The purpose was to prevent any contamination of the sweet crude oil being carried by the other lines. The amount of oil required to be drained off depended upon the extent of the leakage in the valves, on temperature changes, and on the amount of pressure. During 1934 and until November 1935, plaintiff entered at least one of these gatehouses on four days out of each week and drained off the leakage of gas and oil in accordance with the instructions of his superintendent. Plaintiff had no instructions to open the windows and doors of the gatehouses, but most always did so. In his work, plaintiff used a gallon bucket, without a bail, and in ten or fifteen minutes drained off the leakage, amounting to ½ to 3 gallons of sour crude oil, and took it out and burned it. He also emptied the oil from pans that were placed under the flanges to catch oil drips. Plaintiff's work required him to be in a gatehouse for from 30 minutes to an hour per day, four days per week. The odor of hydrogen sulphide gas was always present in these gatehouses and he smelled it for awhile, but "after a minute or so" he didn't smell it. On each occasion, while the sour crude oil was being drained off (called bleeding the valves), the fumes and escaping hydrogen sulphide gas from the sour crude oil burned plaintiff's nose, eyes and mouth. His nose would "run" and his throat would be irritated. Sometimes he had to cough or would get dizzy, nauseated or have headaches and would go outside and sit down in the fresh air before he could go on. Everytime he would go in the gatehouses it would make him a little worse. His heart began to bother him. He told his superintendent, Mr. Cartwell, that he thought the gas was affecting him, hurting him. Mr. Cartwell told plaintiff that he must be mistaken and to go ahead until he could get somebody to take his (plaintiff's) place. Plaintiff continued working until November 1935, when he became so ill that he could go no further, and he had to quit work.

At the time of the trial plaintiff was suffering from fibrosis of the lungs and enlargement of the heart and was totally and permanently disabled for normal manual labor. His heart was enlarged about 35% to 45% and the fibrosis in his lungs ██ extended pretty well throughout both of his lungs. The heart disease was referred to as cardiac hypertrophy. The fibrotic condition of his lungs were referred to as an abnormal or diseased condition resulting from constant irritation and inflammation caused by inhalation of harmful quantities of hydrogen sulphide gas over a long period. This fibrotic condition of the lungs, or accumulation of scar tissue, resulted from

repeated healing after irritation. This scar tissue imposed an undue burden on the heart in completing the circulation of the blood. As a consequence, the wall muscles of the heart became weakened and gradual dilation of the heart resulted.

According to plaintiff's evidence, a concentration of "twenty parts per million of hydrogen sulphide gas is the tolerable maximum amount that it's safe to be around." Concentrations of 1/10 to 1% or more "will knock a man cold in about two breaths and he will die in many cases" unless artificial respiration is given immediately and continued for many minutes. The gas "paralyzes the nerves that control breathing in the body." One of plaintiff's witnesses testified that "sub-acute poisoning . . . is characterized by inflammation of the eyes, the nasal passages of the nose, the two tubes leading to the lungs and the lungs themselves, because it's associated with swelling of the lungs, hemorrhage, and in a number of cases pneumonia, . . . This sub-acute form of hydrogen sulphide poisoning can be obtained from much smaller concentrations than the acute form, anything above twenty parts per million. That's 2/1000 of 1% of hydrogen sulphide in the air causing that form of poisoning." Where the concentration of hydrogen sulphide gas is 50 parts per million "a person smells it (the gas) at first, but within a minute or two he has become insensitive to it and cannot smell the properties of the gas." This is due to "the paralysis to some degree of that small peripheral nerve" (the little nerves).

Dr. Lloyd B. Thomas, a chemist, testified that if a concentration of the gas, sufficient to irritate the eyes, nose and nasal passages and occasionally make a person dizzy or cough, was inhaled thirty minutes to an hour a day, for four days per week, for a period of two years, the concentration would be sufficient to be definitely dangerous to health and to permanently injure the lungs. The witness further testified that if a person smelled the gas "at first but within a minute or two he has become insensitive to it" and if it caused "the running of the nose and such things," he would say hydrogen sulphide gas was present in "something like fifty parts per million."

Dr. R. Hamilton Staton, a physician, testified that, in view of the history of plaintiff's work, his examination of plaintiff in 1935 and his subsequent examination and treatment, it was his opinion that plaintiff's condition was due to hydrogen sulphide gas. It was further his opinion that contact with hydrogen sulphide gas escaping from sour crude oil, under the circumstances under which plaintiff worked, where the concentration was sufficient to cause irritation of the eyes, nose and respiratory tract and occasionally causing coughing, nausea and dizziness, and where that concentration of the gas was inhaled for from thirty minutes to an hour per day for four days per week over a period of two years, would be sufficient to cause plaintiff's condition; that he found nothing else in his treatment or

examination of plaintiff that could have caused it; that a continuous inhalation of hydrogen sulphide gas (not sufficient to cause acute poisoning) would produce a fibrotic condition of the lungs and hypertrophy or enlargement of the heart; and that plaintiff was in his opinion suffering from sub-acute or chronic hydrogen sulphide gas poisoning, that is, the "chronic effect because the effect will pile up, but the gas won't pile up because it's oxidized quickly."

Dr. Clyde Donaldson, a physician, testified that plaintiff suffered from fibrosis or scar tissue of the lungs; that fibrosis was a disease; that it was the result of inflammation; that inhaling hydrogen sulphide gas (of sufficient concentration to burn the eyes, irritate the nasal passages, cause occasional dizziness and nausea) for 30 minutes to an hour per day four days per week for two years could or would produce the results he saw in plaintiff's physical condition; that in his opinion it did produce the result; that anything that will irritate the lungs and inflame them will leave a fibrosis, like silica—resulting in silicosis.

Dr. A. J. Cooper, a physician, gave it as his opinion that the condition of plaintiff's heart and lungs was the result of chronic absorption of hydrogen sulphide gas; that he had examined twenty or thirty men in the last ten years who were in similar condition due to the inhalation of hydrogen sulphide gas.

Dr. W. D. Black testified that prolonged exposure to inhalation of low concentrations of hydrogen sulphide gas may result in a chronic form of poisoning; that some individuals are much more susceptible to it than others; that the chief result of chronic hydrogen sulphide poisoning was fibrosis of the lungs, scar tissue or thickening. "Like a scar, from irritation of some kind or another." The witness stated that, based upon plaintiff's history, the condition of plaintiff's heart and lungs was in his opinion caused by the inhalation of hydrogen sulphide gas. The witness further stated: "You may expect that those who are exposed over a long period of time, even to small quantities of hydrogen gas, are left in a worse condition than the man who is completely knocked out with it at one time and does not die. The effect on the lung over a long period of time causes fibrosis, bronchiectasis, and resulting from that, a dilated heart." The witness further stated "that the slow absorption of hydrogen sulphide does leave a cumulative effect, even though the poison gas itself does not remain in the body." "It is a cumulative poison because it has been done away with and oxidized but has left its mark."

There was evidence that there were "effective means, methods and devices used by oil companies and those engaged in the handling of sour crude oil, for the prevention of hydrogen sulphide poisoning of workers"; and that there were many types of masks and ventilating equipment which were used and recommended by the U. S. Bureaus of Public Health, and which were "commonly used by the oil com-

panies and those that handle sour crude oils." Witnesses described in detail particular equipment.

It was stipulated and agreed that the parties to the action had accepted and were operating under the Missouri Workmen's Compensation Act, except as to the provisions regarding occupational diseases.

Appellant (defendant) assigns error on the overruling of its demurrer to the evidence and contends there was no proof (1) "that the sour crude oil transported by the defendant contained or emitted hydrogen sulphide gas in harmful quantities or concentrations sufficient to produce the disease of fibrosis of the lungs and enlargement of the heart"; (2) that the fibrotic condition of plaintiff's lungs was "caused by hydrogen sulphide gas"; (3) "that any device, means or method for the prevention of inhalation of hydrogen sulphide gas was used or had been recognized as necessary to use by the pipe line industry or in similar industries, under similar conditions, and in similar places"; or (4) "that fibrosis of the lungs and enlargement of the heart were diseases peculiar and incident to pipe line employees engaged in the transportation of sour crude oil." Appellant insists that the evidence shows that "plaintiff's injuries, if any, were the direct result of an accident or series of accidents."

In support of its first contention, appellant relies on its own evidence (apparently disbelieved by the jury) tending to show that tests were made every two months during the entire period that plaintiff worked; and that these tests showed hydrogen sulphide gas was not present in harmful or dangerous quantities or concentrations. Appellant also relies on certain excluded evidence, to-wit, what "Mr. Hawthorne would have testified," if permitted, but it did not assign the exclusion of this evidence as error.

We think the admissions of defendant prior to beginning the transportation of sour crude oil, the evidence concerning the amount or extent of concentration of hydrogen sulphide gas in sour crude oil from the Winkler field, the inferences which could be drawn from the evidence with reference to the effect of the fumes from the oil on plaintiff's eyes, nose and throat, the evidence that after he had been exposed to the gas for a minute or two he would cease to smell its characteristic odor and the evidence that harmful concentrations of the gas were required to produce such results, was sufficient evidence from which the jury could infer and find that harmful quantities or concentrations of the gas existed in the sour crude oil being transported by defendant; that the gas was present in the gatehouses in quantities or concentrations sufficient to be harmful; and that plaintiff came in contact with harmful quantities of the gas under harmful conditions.

Appellant insists that "plaintiff's condition had ample explanation in his previous illnesses, independent of any inhalation of

hydrogen sulphide gas''; and that there was no substantial showing as to which of the possible causes did produce the condition or diseases shown to exist.

It will be unnecessary to review the evidence, including the opinions of experts, tending to show that (taking into account plaintiff's prior illnesses) the fibrotic condition of plaintiff's lungs and the enlargement of his heart were caused by the inhalation of harmful quantities of hydrogen sulphide gas over a period of time. We think the evidence entirely adequate to make a submissible case for a jury on this issue.

On the issue of devices, means or methods for the prevention of injury by hydrogen sulphide gas, appellant says that, even if it be conceded ''that the sour crude oil pumped by the defendant contained and emitted hydrogen sulphide gas in harmful and dangerous quantities and that hydrogen sulphide gas in harmful and dangerous quantities existed in the gatehouses while plaintiff was draining the valves and that a mask or respirator was necessary to protect the plaintiff from the dangers of contracting fibrosis of the lungs and enlargement of the heart,'' the court should have sustained the demurrer *because gas masks or respirators were not used or required in the industry*. Appellant insists that plaintiff is bound by his testimony that he had never seen or heard of a pipe line walker using a gas mask or carrying a gas mask, and that he did not think the other pipe line walkers he knew used gas masks. Appellant further says that plaintiff's witness, who testified concerning means, methods and devices in the oil industry for the protection of employees against hydrogen sulphide gas was not a qualified witness and that his testimony had no probative value. Appellant relies, particularly, on Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 100 S. W. (2d) 909, 922; and Wommack v. Orr, 352 Mo. 113, 176 S. W. (2d) 477; and says that ''the statute sets up no specific standard, and requires no specific equipment'' and, therefore, the test is ''what is found to be reasonably safe by usage and is commonly and ordinarily used in other similar places, occupations and businesses.'' Smith v. Harbison-Walker Refractories Co., supra, (100 S. W. (2d) 909, 922).

We think the evidence concerning effective means, devices and methods used by oil companies engaged in handling sour crude oil to prevent injury to employees by hydrogen sulphide gas was entirely sufficient to make an issue for a jury and that, regardless of defendant's evidence of custom in the industry and of defendant's finding from its own experience in handling sour crude oil that masks were unnecessary, defendant was required by the statute to use approved and effective devices to protect plaintiff from the danger of contracting fibrosis of the lungs and enlargement of the heart, if these diseases were incident to the work, trade or processes in which plaintiff was

engaged. The case of Smith v. Harbison-Walker Refractories Co., supra, so holds. "Therefore, under this statute, to hold the employer liable it is only necessary to find that the devices, means, or methods used were ineffective to make the place of work reasonably safe from the dangers intended to be prevented. . . . Of course, if in spite of the dust removal device used, dust was emitted into plaintiff's place of work, in such quantities as to be harmful, such device would not be 'effective' and further 'means or methods' would be required by the statute. . . . No usage in industry would make it proper to use as safety equipment a device which did not make the place of work reasonably safe, and which failed to accomplish the purpose for which it was intended." (100 S. W. (2d) 909, 923, 924). The Wommack case, supra, was not under the statute, but was a common law action.

Finally, on the issue of the demurrer to the evidence, appellant insists that plaintiff was not only required to prove his condition was caused by the inhalation of hydrogen sulphide gas, but to further establish that the diseases mentioned were peculiar *and* incident to the pipe line industry engaged in transporting sour crude oil. Appellant insists there was no proof that the diseases complained of "were diseases which, in the common experience of humanity, or of the industry, any employee of a pipe line company transporting sour crude oil could, in the usual course of events, normally expect to contract"; or that these diseases "were due wholly to causes and conditions which are normal, constantly present, and characteristic of" the pipe line industry transporting sour crude oil; or that they "commonly, usually or naturally resulted from working in and around sour crude oil" and "from the inhalation of hydrogen sulphide gas." Appellant says that "nowhere was any attempt made to show that pipe line walkers, handling or coming in contact with sour crude oil in its transportation through pipe lines, were commonly or ever, afflicted with fibrosis of the lungs or enlargement of the heart." It appeared from defendant's evidence that other pipe line walkers were not required to do the same kind of work as plaintiff, since they only drained the valves about twice a year. Appellant relies upon Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W. (2d) 323; Smith v. Harbison-Walker Refractories Co., supra; Downey v. Kansas City Gas Co., 338 Mo. 803, 92 S. W. (2d) 580; State ex rel. Fisher Body St. Louis Co. et al. v. Shain, 345 Mo. 962, 137 S. W. (2d) 546; and other cases.

In the Wolf case there was no evidence that plaintiff's condition was due to zinc poisoning or to contact with the dust from zinc sulphate with which plaintiff worked.

In the Smith case defendant contended there was no evidence that silicosis was a disease incidental or peculiar to the fire brick industry. In holding that a case was made for the jury under the occupational

disease statutes, the court said: "Plaintiff's proof showed long exposure to dust, lung conditions such as dust does produce, analysis of the dust showing contents that medical testimony said would produce a dust disease, and expert opinions that his exposure to this dust caused a diseased lung condition, and that this condition was silicosis. . . . It was shown by the evidence that pure silica makes a dust poisonous to the lungs; that silicosis is a disease which is a natural and peculiar result of breathing dust which contains silica particles of a certain size, character, and quantity; so it undoubtedly is at least a reasonable inference that silicosis is incidental and peculiar to any work or process which produces and projects into the place of work silica particles of a harmful size, character and quantity."

In the Downey case there was no evidence that claimant's "injury or 'disease' . . . was contracted in the usual and ordinary course of events incidental to his employment . . . as where one breathes dust laden atmosphere in his working place or the like." (92 S. W. (2d) 580, 585).

In the case of State ex rel. Fisher Body St. Louis Co. v. Shain, supra, that part of an opinion by the Kansas City Court of Appeals defining an occupational disease (within the meaning of the compensation law) as "a disease caused by and directly resulting from working conditions," was quashed for conflict with the Downey case, supra.

The cases relied upon do not support the contention that no case was made for the jury on the issue of occupational diseases.

In the case of Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328, plaintiff based his action upon a violation of Secs. 13252 and 13253, R. S. 1929 (now Secs. 10211 and 10212, R. S. 1939), and sought damages for personal injury and disease alleged to have been sustained while employed by defendant. In the course of his work plaintiff constantly inhaled gasoline fumes from a paint mixture used in a spraying operation. Plaintiff's evidence tended to show the poisonous effect of the gasoline fumes. After about four months, plaintiff began to suffer from headaches, dizzy spells, cramps, vomiting and coughing, which according to the opinion of experts, was due to poisoning caused by the inhalation of gasoline fumes from a spraying process. There was evidence that the spraying process was such, that, unless effective devices, means or methods were employed, an employee would be exposed and subjected to the danger of poisoning, the impairment of health and irritation and inflammation of the respiratory organs. The court said: (61 S. W. (2d) 328, 332) "What we have said relative to the sufficiency of the proof to make a case under Sec. 13252, supra, disposes of appellant's second contention, that 'plaintiff's evidence failed to bring the case within the occupational disease statutes because he did not produce

testimony showing that the disease of pneumonia is incident or peculiar to the work or process in which he was employed.' The evidence shows the illness which immediately and directly resulted from the exposure to and inhalation of the poisonous fumes was such as is incident to that work or process and the causal connection between that illness, producing as it did a weakened and lowered resistance of the lungs and respiratory tract to infection, and the consequent pneumonia.''

In Evans v. Chevrolet Motor Co., 232 Mo. App. 927, 105 S. W. (2d) 1081, it was held that there was sufficient competent evidence to support a finding of the Workmen's Compensation Commission that claimant's alleged occupational disease was peculiar and incident to his particular employment where there was evidence of direct causal ▮▮▮▮ connection between plaintiff's condition and the peril incident to his employment by reason of exposure to the irritating properties of a soapy solution he was required to use in his work.

In the case of Langeneckert v. St. Louis Sulphur & Chemical Co. (Mo. App.), 65 S. W. (2d) 648, it was held that a case was made for the jury under the occupational disease statutes for injury resulting from the inhalation of sulphur dust while employed in pulverising crude sulphur, where there was medical testimony that the sulphur dust was a poison chemical and caused the impairment of plaintiff's lungs.

While the evidence does not show that fibrosis of the lungs and enlargement of the heart are illnesses which are exclusively caused by the inhalation of hydrogen sulphide gas, but may result from many causes independent of, unrelated to, and unconnected with such inhalation, and while the evidence does not show that pipe line walkers or pipe line employees as a class were peculiarly subject to fibrosis of the lungs or enlargement of the heart or that any pipe line walker working under the same conditions under which plaintiff worked had incurred these diseases, the evidence does show that those employees coming in contact (over a long period of time) with even small quantities of hydrogen sulphide gas escaping from sour crude oil might reasonably expect to have fibrosis of the lungs and enlargement of the heart. There was evidence that hydrogen sulphide gas was poisonous and toxic; that it irritated and inflamed the lungs; that the inhalation of a sufficient concentration of the gas to irritate the eyes, nose and throat, cause coughing and occasionally dizziness, nausea and headaches, would, if inhaled for the period and under the circumstances and time inhaled by plaintiff, cause said diseases. There was further expert opinion evidence that the inhalation of the gas under the circumstances of plaintiff's employment would and did cause the said diseases. The evidence was sufficient to show that plaintiff incurred said diseases as a direct result of defendant's failure to comply with the statute by adopting approved devices to protect

plaintiff against the dangers and diseases incident to the inhalation of hydrogen sulphide gas escaping from sour crude oil about which he was required to work.

Appellant's theory that "plaintiff's injuries, if any, were the direct result of accident or series of accidents," is based upon the testimony of certain of plaintiff's witnesses that the inhalation of concentrations of more than 20 parts in a million of hydrogen sulphide gas over a period of time would cause the lungs to be irritated and to bleed; that it was like cutting your finger with a knife; that plaintiff's condition resulted from an accumulation of scar tissue, which became more dense and less likely to heal; and that pumping blood through the fibrotic lungs overexerted the heart and caused it to enlarge. Appellant says this evidence showed violence to the physical structure of the body, which was unforeseen and accidental.

The evidence, considered favorably to plaintiff, shows that fibrosis of the lungs and enlargement of the heart are regarded as diseases or abnormal conditions, which are the chronic effect of hydrogen sulphide gas poisoning; that the conditions or diseases were the cumulative effect of inhalation of low concentrations of hydrogen sulphide gas over a prolonged period of exposure; that the lungs were repeatedly irritated and healed; that breathing the gas was not accidental, but the usual result of the work plaintiff was doing; and that the irritation and the healing or accumulation of scar tissue naturally resulted and overexerted the heart. Appellant cites Downey v. Kansas City Gas Co., supra; McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S. W. (2d) 149; Tindall v. Marshall's U. S. Auto Supply Co., 348 Mo. 1189, 159 S. W. (2d) 302; and other cases.

None of the cases cited were decided on similar facts. We have commented on the Downey case supra. In the McKay case, plaintiff's action was based upon the theory that plaintiff's injuries resulted from physical violence to the structure of the body at a particular time and place, and plaintiff sought to avoid the compensation law on the theory that he was not an employee. No gradual and cumulative poisoning and resulting disease was involved.

In the Tindall case, plaintiff sued to recover for injuries alleged to have been caused by carbon monoxide poisoning suffered by him in his employment. Recovery was denied on the theory that "there was no substantial proof of gradual and cumulative poisoning, but only of injury by accident." The court said: "While the evidence shows that noxious gases are common in garages, it was not shown that such gases are commonly present in such harmful quantity as to cause disease or injury. The evidence shows that when such gases do exist in harmful quantity it is due to shutting off the flow of air from the outside. That constitutes an unforeseen event, happening more or less suddenly and violently and producing objective symptoms of an injury within the meaning of the Compensation Act."

There was nothing accidental about draining the sour crude oil out of the valves in accordance with instructions, or about the hydrogen sulphide gas escaping from the sour crude oil as it was drained out. The injury to plaintiff resulted naturally from being subjected, without protection, to harmful concentrations of hydrogen sulphide gas over a period of time and as an incident to plaintiff's employment in and about sour crude oil.

Finally, appellant contends that plaintiff's main instruction upon which the cause was submitted ''was misleading and confusing in that it permitted a recovery upon an insufficient finding and permitted a recovery based upon the defendant's failure to provide devices, means or methods concerning which there was no evidence.'' We have already ruled the last point against appellant and need only determine whether the instruction was misleading or confusing or failed to require a sufficient finding to authorize a verdict for plaintiff.

Instruction I, in hypothesizing other issues of fact necessary to be found by the jury to authorize a verdict for plaintiff, submitted one issue in the alternative, to-wit, if the jury found that fibrosis of the lungs and enlargement of the heart were diseases ''peculiar to the work being done by plaintiff as a pipe line walker'' *or* if they found that his ''employment was such as would and did subject plaintiff to the danger of contracting'' said diseases and ''that such diseases were diseases incident to his work as a pipe line walker,'' then the jury was instructed that it was the duty of defendant, etc. Appellant uses the alternative submission as a basis for contending that the instruction contains two complete instructions, the latter beginning with the word ''or''. Appellant concedes that the first instruction included part of the second instruction but, having reached the conclusion that Instruction I contains two instructions, appellant points out that each instruction is defective in omitting matters contained in the other instruction. While Instruction I is subject to some criticism as being long and repetitious, we find it to be one single instruction with an alternative submission on the issues mentioned. Whether the instruction is misleading or confusing depends upon how it would be understood by a jury composed of ordinarily intelligent laymen when read and considered as a whole along with all of the other instructions in the case. Mueller v. Schien, 352 Mo. 180, 176 S. W. (2d) 449, 453. We find no reason to believe that the jury could have been mislead or confused into believing that they were authorized to find for plaintiff on either of the two theories without a finding of all other necessary facts as submitted by the instruction considered as a whole.

Appellant further contends that the instruction ''makes the defendant an insurer'' and imposes ''a burden impossible to sustain.'' Appellant says ''it is self evident that no device, means or method''

could prevent the contraction of the said diseases under all circumstances and that the instruction gave the jury a roving commission. The instructions imposed no liability on defendant, unless the jury found that the diseases were peculiar or incident to the employment and resulted directly from defendant's negligence in failing to furnish devices, means or methods, if any, found by usage in other similar industries and under similar circumstances to be sufficiently adequate and effective to reasonably protect employees from the danger of contracting said diseases. Smith v. Harbison-Walker Refractories Co., supra, (340 Mo. 389, 413, 100 S. W. (2d) 909). The contention is overruled.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.