Farrell E. BRESHEARS et al., Respondents,

v.

UNION ELECTRIC COMPANY of Missouri, a corporation, Appellant,

and

Claude Kays, Vesta Kays, Wilbur Boring and Lucile Boring, Defendants.

No. 49905.

Supreme Court of Missouri,

In Banc.

Jan. 13, 1964.

H. C. Salveter, Sedalia, Harry H. Kay, Eldon (John A. Woodbridge, St. Louis, of counsel), for appellant.

George H. Miller, Sedalia, F. M. Brady, Warsaw, for respondents.

EAGER, Chief Justice.

This is a suit for damage to crops in the June-July, 1951, flood on the Lake of the Ozarks; it is based on the theory of trespass. The case has been here previously, the opinion appearing at Mo., 347 S.W.2d 233; there a judgment for plaintiffs was reversed because of deficiencies in plaintiffs' main verdict-directing instruction. The amended petition upon which the case was tried is in thirteen counts, and there are thirteen plaintiff "units," i. e., individual plaintiffs or married couples, all of whom are farmers along the Osage, the Pomme de Terre or the Little Pomme de Terre. These farms are located, generally speaking, between Warsaw and Osceola. Each count involves damage to crops owned by the appropriate plaintiff or plaintiffs. We note an earlier case, reported at Mo., 313 S.W.2d 638, in which the four Breshears who are plaintiffs here recovered a judgment for crop damages arising out of the same flood. That was obviously a different claim, for no point of res adjudicata is raised as it certainly would be had the claims been the same. The plaintiffs here recovered, in the aggregate, $38,632.70 and after a timely motion for new trial (overruled under the ninety-day rule) defendant Union Electric Company appealed. The individual defendants were mere formal parties.

The evidence was substantially the same as in the prior trial and thus it is as related in some detail at 347 S.W.2d 233. The theory of plaintiffs was and is twofold, namely: (a) that defendant's power dam at Bagnell had, by impounding the waters and creating the Lake of the Ozarks, retarded the flow of the water in the Osage and its tributaries and had caused large quantities of silt, sand, gravel, etc., to be deposited along the course of the river and its tributaries; that these deposits decreased the carrying capacities of the streams, and in times of high water (specifically in 1951) contributed to cause the flood water to back up and overflow plaintiffs' lands; also, (b) that the lake itself acted as a retarding agent upon the natural drainage of overflow waters and impaired and decreased the flood carrying capacities of the rivers, thus contributing to the overflow of plaintiffs' lands and crops; and that the waters would not have flooded plaintiffs' lands had it not been for the presence of the dam. Defendant's theory was that there was no material restriction of the river channel by silting, that the presence of the lake did not cause or contribute to the overflow, and that this flood would have overflowed plaintiffs' lands and crops whether the lake and dam had been there or not.

In view of the nature of the points raised here, we will not need to state the evidence in detail. As previously, there was much evidence of silting at various points in the Osage below the plaintiffs' farms, with testimony that this restricted the channel; there was opinion evidence, lay and expert, that at flood times the silting retarded the flow and decreased the velocity of the streams, and that it contributed to cause the water to back up on plaintiffs' lands and to stay there longer. There was also evidence for plaintiffs that the presence of the lake itself retarded and slowed the flow of the flood waters and contributed to the same result. On defendant's behalf there was much evidence, largely by exhibits and expert testimony, tending to show that there was no material restriction of the channel by silting, that the river scoured out its channel when necessary, and that there was no adverse effect on plaintiffs' lands from the presence of the lake and dam or from

any silting. The defendant had taken easements from the plaintiffs permitting overflows up to certain levels; most of these permitted flooding up to 673 feet above sea level. All the damages claimed here were for flooding above the level of the respective easements.

There was a great deal of evidence, both oral and documentary, concerning prior and subsequent floods,—from 1895 to 1961, with detailed comparisons. The ones principally discussed were in 1895, 1929, 1935, 1941, 1943, 1951, 1958 and 1961. The dam was built in the period from 1929 to 1931, and the lake was filled by 1935. Sundry charts, tables, profiles, and cross-sections of the channel and flood plain of the Osage were received in evidence for the purpose of showing rainfall, gauge readings, river capacity, velocity of the water, lake levels, river levels, volumes of discharge passing given points, lake inflow and outflow, etc. While perhaps not vital here, it was shown that in the first flood after the dam was constructed (1935) the lake level at the dam was only permitted to rise to 660 feet (or a trifle less), whereas in 1951 it rose to 664.4 feet. The dam, of course, contained flood gates for the release of water when desired, but this case is not founded upon any theory of negligence. We mention these lake levels solely because of plaintiffs' theory and evidence that a higher lake causes a greater retarding effect.

Darrell Adams, a consulting engineer, testified for plaintiffs; in the course of his testimony he expressed opinions which substantiated plaintiffs' theory that the flood waters were retarded and caused to spread out (and thus overflow plaintiffs' lands) by the silting and by the very presence of the lake. He testified in considerable detail, giving the results of his investigations; these involved the floods of 1929 and 1935, as well as the one of 1951. He also testified that the velocity of flood waters is slowed when it spreads outside the river channel and that the velocity is or should be greater in the channel than in the overflow, increasing as the water rises further. In the course of his examination plaintiffs offered in evidence and the court received a chart which the witness had prepared, designated as Plaintiffs' Exhibit 8. That chart contained figures showing comparisons between four different floods. Since its competency is one of the two points raised on this appeal, we set it out, as follows:

| Year | Warsaw Gauge In Feet | Velocity Feet Per Sec. | Discharge Cu. Ft. Per Sec. | Lake Level | Rainfall 7 Day Ave. Before Crest |
|---|---|---|---|---|---|
| 1929 May 19 | 34.8 | 5.17 | 90,000 | | 0.74 |
| 1935 June 3 | 34.0 | 5.72 | 94,000 | 659.9 | 0.73 |
| 1941 Nov. 2 | 34.5 | 5.44 | 88,600 | 661.4 | |
| 1951 July 7 | 40.1 | 4.94 | 111,200 | 664.4 | 0.34 |

(We have omitted certain designations showing the sources of some of these figures. That element will be discussed later.) Previously, Plaintiffs' Exhibit 7 had been received in evidence; that was a chart showing, among other things, the gauge readings at Warsaw in the floods of 1922, 1927, 1929, 1935, 1946, 1951 and 1958. The maximum of these readings prior to 1951 was 35.2 feet (in 1946 and 1958); the reading in 1951 was 40.1 feet. All of that information came from published data of

the Weather Bureau or of the U. S. Geological Survey. Exhibit 7 was used largely for a comparison of average rainfalls and maximum gauge readings.

When Exhibit 8 was offered, there was no objection; however, we do not hold that to be controlling, under these circumstances. The witness explained the figures of Exhibit 8 in some detail; he had gotten a good many of the figures from defendant, some from Weather Bureau Publications, and some from U. S. G. S. publications; he had apparently gotten the last three velocity figures from the Union Electric as well as most of the "Discharge" figures. The May, 1929, flood referred to on this exhibit occurred prior to the building of the dam. Mr. Adams testified: that at a gauge of 40.1 feet (1951) the river should, under natural conditions, have a much greater velocity than at a gauge reading of 34; that, in his opinion, the velocity at 40.1 feet should be at least six and one-half feet per second instead of the recorded 4.94 feet; also, that the volume of 111,200 cubic feet per second in 1951 should have been in the neighborhood of 140,000 cubic feet if "allowed to flow." In comparing the 1951 flood with the 1935 flood, and explaining why, in his opinion, the lands in question were not overflowed in 1935, the witness said: "I think that in 1935 there had been a lot of clearing done; the water was moving faster, the lake level was not allowed to get above 660, and it was flowing out through the dam, flowing downstream as fast as it was flowing in. It was acting more nearly like a natural stream. * * * in 1951 the lake level was 4.4 feet, roughly, above anything in 1935; therefore, this water was coming down and hitting this lake or this 4.4 feet higher water, and it slowed it down to this 4.94 feet per second reading. * * * if the velocity is slowed, it has to rise and spread out in order to obtain cross-sectional area enough to pass this water." In the course of a rather detailed cross-examination, the witness was shown a sheet of the U. S. Geological Survey (Defendants' Exhibit a), showing "Discharge

measurements" on the Osage at high water stages in the years 1926–1943; in part, this showed the following:

"5–21–29 * * Mean Velocity
* a 4.53
b 5.17 * * * *
a main channel
b overflow"

On five subsequent measurements of velocity in this exhibit the letter "b" (overflow) appears opposite the first figure which is in each instance substantially less than the subsequent "a" figure. A stamp appears on the exhibit as follows: "Unpublished Records Subject To Revision." Mr. Adams, when confronted with the statement of counsel that the figure 5.17 was shown to be the velocity in the overflow, stated that "this is backwards," and that the channel measurement "would be faster," but that he had not seen the paper before and that he would try to find the source of his 1929 velocity figure, "5.17." Toward the end of the trial this witness was recalled by defendant; he stated that he had looked for the figure but had not found it, that "everything on these charts came from Union Electric, U. S. G. S. or the Weather Bureau," and that he "believed" that the figure came from the Weather Bureau, but could not confirm it. He admitted that the point sought to be made by Exhibit 8 was that there was a higher velocity in 1929, before the dam was built, with a stage of 34.8 feet than there was in 1951, with a stage of 40.1 feet. He further testified, however, that the same comparison was applicable to the 1935 and 1951 figures, both of which velocities were furnished by Union Electric, and that the velocity of 1951 should have been much greater. Counsel for defendant then moved that "Exhibit 8 be excluded from the record and the jury be instructed to disregard it for the reason that it is now shown that the figures which went into it were not verified and cannot be verified by the plaintiffs and the man who prepared them." After considerable colloquy the motion was overruled, the Court commenting

that it might be considered "for whatever it is worth."

Defendant's counsel insist here that the entire exhibit was offered to furnish a demonstrative comparison of the action of the flood waters before and after the dam or, in other words, to show that they flowed faster before the dam was built; and that, since the 1929 velocity relied on (5.17 feet per second) was unverified, the whole exhibit was inadmissible. They cite a case permitting an objection at the time when it first became apparent to counsel that the evidence was inadmissible. Kansas City v. Thomson, Mo., 208 S.W.2d 216. We concede that principle. The difficulty here is that, after the witness was recalled, counsel moved to exclude the whole exhibit, assuming then and now that there were and are no admissible parts in it. The principle is well established that if any part of an exhibit is admissible an objection going to the whole of it is properly overruled. Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 55 A.L.R.2d 1022, and numerous cases there cited. While the comparison of flows before and after the dam was perhaps the principal purpose of this exhibit, it also tended materially to show a slowing of the velocities in the floods from 1935, about the time the lake was first filled, to 1951, after it had existed for sixteen more years; it thus had some bearing upon the theory of retardation by silting, and of retardation by the higher level to which the lake was permitted to stand in 1951, even had the velocity figure for 1929 been eliminated. It further showed "discharge" comparisons which were conceivably material on the issues. These things were also explained and discussed by the witness. It is entirely clear to us that the whole exhibit was not inadmissible, "demonstrative" though it be as counsel says, and that the motion was properly overruled. While we stand on the reasons thus stated, we are not wholly convinced that even the figure "5.17" was inadmissible, in view of the testimony of Mr. Adams and the apparent confusion and discrepancies in Defendant's Exhibit A (the Geological Survey Report) which bore the figures 4.53 and 5.17, but with footnotes designated in the inverse order from those of five subsequent years. In our view we do not need to rule this specific point. We do not rely upon the contention that this exhibit was merely cumulative of lay testimony that the velocity was slowed after the dam was built for, intrinsically, this exhibit was a type of evidence different from that oral, lay testimony. The point made concerning Exhibit 8 is denied.

Counsel suggests that if his motion to strike the exhibit should be held ineffective, then we should hold its admission to be error under our inherent power to recognize and reverse for "plain error" under Rule 79.04, V.A.M.R. The record here does not indicate to us an intentional use of incorrect data by the witness; it rather tends to indicate a serious question as to the accuracy of the Geological Survey notes for the year 1929 in Exhibit A. No witness attempted to explain the apparent discrepancy in those figures, or to refute Mr. Adams' testimony that "this is backwards." Rule 79.04 is invoked at times in instances where the Court deems that manifest injustice *"has resulted therefrom,"* which means, of course, from the error claimed to have been committed. Also, the rule is not a refuge for the failure to make proper objections. Critcher v. Rudy Fick, Inc., Mo., 315 S.W.2d 421. It rather seems to us that defendant's highly sagacious counsel here elected to take his chances on excluding the entire exhibit and, having done so, he must stay with his election. Kelly v. Terminal R. R. Ass'n of St. Louis, Mo., 315 S.W.2d 699, 704. Nor are we convinced that the admission of the 5.17 foot velocity figure, whether erroneous or not if specifically objected to (and of that we are doubtful), resulted in manifest injustice. In one sense it was cumulative though, as already noted, not technically so; the jury heard all the testimony, pro and con, regarding that controverted velocity figure, and heard the full discussion of

Defendant's Exhibit A with the supposed government figures for 1929. Moreover, it certainly could have decided the case just as it did with the 5.17 figure stricken. This is not a case for the application of Rule 79.04. See, generally, Faught v. Washam, Mo., 329 S.W.2d 588, 599; Parmley v. Henks, Mo., 285 S.W.2d 710.

The remaining point concerns plaintiffs' Instruction No. 1. In view of the objections, it is necessary to quote it in full. It was as follows: "The court instructs the jury that if you find and believe from the evidence that in the months of June and July, 1951, the defendant Union Electric Company, owned and operated a hydroelectric dam across the Osage River at Bagnell, Missouri, and if you further find that said dam impounded the water of the Osage River, creating a reservoir which at full stage of 660 feet above mean sea level extended from Bagnell, Missouri, to approximately the county line between Henry and St. Clair Counties; and if you further find that Plaintiffs' farms in question were either upon or nearby the said reservoir as it extended above Warsaw, Missouri; and if you further find and believe that as a result of the construction, operation and maintenance of the dam at Bagnell by the Defendant silt deposits had been formed in the channel and along the banks of the Osage River in and around Warsaw and to a lesser degree at the various places mentioned in evidence up the river to Smart Island by June, 1951; and if you further find that said silt deposits retarded the flow of the Osage River and its tributaries in the vicinity from Warsaw, Missouri, west past Plaintiffs' farms in June and July, 1951, thereby contributing to cause the flood waters of the Osage River to go upon Plaintiffs' farms in June and July, 1951, and destroy the crops in question; and if you further find and believe from the evidence that in the latter part of June and early part of July, 1951 the lake, resulting from the construction and operation of the dam acted as a retarding agent upon the natural drainage of overflow water from the Osage River and its tributaries thereby greatly impairing and decreasing the natural floodwater carrying capacity of the Osage River and its tributaries in the vicinity of plaintiffs farms and if you find that the presence of said lake together with the silting caused the flood waters of the Osage River to go upon plaintiffs farms in June and July of 1951 and destroy the crops in question; then your verdict will be against the Defendant and in favor of the Plaintiffs; unless you further find and believe from the evidence that Plaintiffs' damages, if any, were caused by an unprecedented rainfall in such amounts that plaintiffs' crops in question would have been destroyed even though Defendant's dam had never been built." A comparison of this instruction with the one previously held deficient by this Court (347 S.W.2d 233) shows that plaintiffs have now hypothesized: that silting had occurred at various places because of the dam; that the silting retarded the flow of the Osage and its tributaries and (see discussion under (b) later) contributed to the flooding of plaintiffs' lands and crops; that the lake itself acted as a retarding agent and similarly contributed; and that these two elements jointly caused the damage.

The errors now assigned to the giving of this instruction are: (a) that it erroneously referred to a "full stage of 660 feet" in that such a reference was not justified by the evidence and was misleading; (b) it assumed that if the silt deposits "retarded the flow," they "thereby" contributed to cause the flooding of plaintiffs' farms, which was a highly controversial issue; and (c), it assumed that if the lake acted as a retarding agent upon the overflow waters, it "greatly" impaired the natural flood carrying capacity of the river and its tributaries, whereas the whole question of any such retardation and its possible effect was a disputed fact issue. We consider these in order. As to (a), defendant contends that "full stage" of 660 feet gave the jury the impression that at such stage the lake was full from the dam clear on past

plaintiffs' farms and that there would be no place for flood water to go; and that the lake actually would not be "full" until the water reached the level of the easements on plaintiffs' lands, most of which extended to 673 feet; that the term was not justified by the evidence, that it gave the impression that defendant had no right to raise the lake level above 660 feet, and that it was confusing. Counsel cite Smith v. Stanolind Pipe Line Co., 354 Mo. 250, 189 S.W.2d 244, to the effect that whether an instruction is confusing depends upon how it would be understood by a jury of ordinarily intelligent laymen. That is true. Here the evidence definitely showed that at 660 feet the lake extended to and "feathered out" at the county line between Henry and St. Clair Counties. The instruction required the jury to so find. The words "full stage" were added as a descriptive term; one of defendant's own engineer-experts testified that "We now consider normal full pool as 660"; the other referred to "the normal full lake elevation of 660." Mr. Adams, plaintiffs' engineer, testified that "full pool reservoir" was 660 feet. Other testimony showed that at 660 feet the lake in the vicinity in question was about two-thirds bank full, and the record is replete with discussions and minute descriptions of water levels near or at plaintiffs' farms at different gauge readings and at specific flood stages. Some of the plaintiffs detailed what parts of their lands were flooded at different elevations. Upon this record it would not be realistic to hold that the use of the term in question confused or misled an ordinarily intelligent jury.

■ Point (b). Counsel says that the term "thereby contributing" assumes that the silt deposits did contribute to the flooding of plaintiffs' lands. The instruction expressly required the jury to find that the dam caused silting and that the silt deposits retarded the flow past plaintiffs' farms. It might have been preferable thereafter to have used the words "and that they thereby contributed to cause * * *" in lieu of the phrase "thereby contributing to cause * * *" but, considering the instruction as a whole, we believe that the jury would understand it as requiring a finding on the question of contribution, as well as upon the issues of silting and retarding. The issues in the case were simple, and certainly the jury understood that it must find that the silting and the lake itself each contributed, and that together they caused the damage. In the latter part of the instruction the jury was expressly required to find that the presence of the lake *and the silting* caused the water to go on plaintiffs' lands. We find no prejudicial error in the use of the wording thus complained of.

The last complaint (c) is that the instruction assumed that if the jury found that the lake acted as a retarding agent upon the natural drainage of overflow water, it *greatly* impaired the flood carrying capacity of the river. The wording actually used (after hypothesizing the retardation) was "thereby greatly impairing and decreasing * * *." The principal complaint is made of the word "greatly," although counsel also insist that the whole phrase assumed an impairment. What we have said in the preceding paragraph concerning the claimed assumption of a fact is also applicable here. An express submission of the impairment would have been preferable, but the jury necessarily understood under this instruction that it must find a sufficient impairment of capacity and retardation of the flood water *by the lake* to contribute to the overflow of plaintiffs' lands, *and* that this and the silting together *caused* that flooding. The word "greatly" could only mean an effect sufficient to contribute to the damage, when viewed with the whole instruction. We find none of these complaints to be sufficiently substantial to constitute prejudicial error.

The judgment is affirmed.

All concur.